# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| DAVID BENHAM; CITIES4LIFE; GLOBAL IMPACT MINISTRIES D/B/A LOVE LIFE AND LOVE LIFE CHARLOTTE,<br><br>         Plaintiffs,<br><br>v.<br><br>CITY OF CHARLOTTE, NORTH CAROLINA; MECKLENBURG COUNTY, NORTH CAROLINA,<br><br>         Defendants. | Case No.<br><br><br>**COMPLAINT** |

## Introduction

1. Across the nation, state and local governments are taking unprecedented executive and legislative actions in an attempt to protect lives from what is known as coronavirus disease 2019 (COVID-19).

2. While many of these efforts are reasonable and even noble, there are troubling instances of governmental authorities imposing overbroad and improperly tailored restrictions, using COVID-19 as cover to impermissibly restrict speech and religious exercise the government opposes while doing nothing to protect life and health—and sometimes even endangering it.

1

3.     One such instance of government overreach recently occurred outside an abortion facility in Charlotte, North Carolina, known as A Preferred Women's Health of Charlotte.

4.     While women in difficult circumstances walked in and out of the abortion facility, individuals associated with two non-profit organizations—Cities4Life and Love Life—stood on the public sidewalk, praying for and offering hope and tangible support to these women. For years, devoted individuals from these charities have dedicated their time and resources to help those in need.

5.     Mindful of both the risks of COVID-19 and the recent state and local orders, Cities4Life and Love Life personnel adhered to applicable regulations and guidance, maintaining social distancing (e.g., standing at least six feet apart) and ensuring that hand sanitizer was available for use. In fact, they even used sidewalk chalk to mark and maintain appropriate distances between individuals.

6.     While the abortion clinic began filling up with clients and numerous people roamed the parks and sidewalks for recreation and exercise, government officials targeted the selfless individuals from Cities4Life and Love Life, who were praying on the sidewalk, maintaining a safe distance from one-another and others, and helping women interested in the important charitable services they offered.

7.     On April 4, 2020, members of the Charlotte-Mecklenburg Police Department arrested or cited the President of Cities4Life, David Benham, and

others from Cities4Life and Love Life for exercising their First Amendment rights to speech and religious exercise in the service of others.

8.      The authorities stated that the arrests occurred under a Revised Joint Proclamation issued by the Mecklenburg County Board of Commissioners and the Mayor of the City of Charlotte, which prohibits certain gatherings of more than 10 people. But the Proclamation expressly exempts the activities of Benham, Cities4Life, and Love Life from that 10-person limit.

9.      Despite the health and safety motivations underlying the COVID-19 restrictions, government officials cannot and should not selectively enforce those regulations. Nor should they prohibit constitutionally protected activities that do not endanger public health or safety. Yet that is exactly what Defendants have done.

10.     Government officials have subjected David Benham, Cities4Life, and Love Life (collectively, "the Advocates") to unlawful harassment, arrest, and citations, demonstrating hostility toward the Advocates' views and religious beliefs.

11.     The Advocates bring this action to protect their ability to exercise their constitutionally protected, life-saving charitable work and to provide critical services to women in need—all while adhering to social distancing guidelines.

**Parties**

12.     Plaintiff David Benham is a natural person, a citizen and resident of North Carolina, and the President and Chairman of the Board of Directors of Cities4Life.

13.     Plaintiff Cities4Life, Inc., is a religious and charitable non-profit corporation organized under North Carolina law.

14.     When operating in the Charlotte area, Cities4Life, Inc., regularly does business as Cities4Life Charlotte.

15.     Cities4Life has standing to bring claims on behalf of its members, including its officers, staff, and volunteers, under the principles of third-party standing and organization standing.

16.     Cities4Life's members would have independent standing to raise, on their own behalf, all claims Cities4Life asserts in this action.

17.     All interests Cities4Life seeks to protect in this action are relevant to its purposes, and neither the claims it asserts nor the relief it requests requires its members to participate in this lawsuit.

18.     Plaintiff Global Impact Ministries, Inc., is a religious and charitable corporation organized under North Carolina law.

19.     Global Impact Ministries, Inc., does business as Love Life and Love Life Charlotte.

4

20.     Love Life has standing to bring claims on behalf of its members, including its officers, staff, and volunteers, under the principles of third-party standing and organizational standing.

21.     Love Life's members would have independent standing to raise, on their own behalf, all claims Love Life asserts in this action.

22.     All interests Love Life seeks to protect in this action are relevant to its purposes, and neither the claims it asserts nor the relief it requests requires its members to participate in this lawsuit.

23.     Defendant City of Charlotte is a municipal corporation organized under North Carolina law and located in Mecklenburg County, North Carolina. It is an entity capable of suing and being sued.

24.     Defendant Mecklenburg County is one of 100 counties in North Carolina. *See* N.C.G.S. § 153A-10. It is an entity capable of suing and being sued. N.C.G.S. § 153A-11.

## Factual Background

**David Benham**

25.     The tragedy of abortion is never far from Benham's heart. He has seen its devastating effects. And he was almost its direct victim.

26.     In 1975, while Benham and his twin brother were in utero, his father thought abortion was the answer. Despite her difficult circumstances, Benham's

mother thought otherwise. The night she gave birth to Benham and his brother, her husband was passed out from excessive drinking.

27.     The transformative power of Jesus Christ is also part of Benham's story. Three months after his birth, Benham's father stepped into a church, became a Christian, and on his walk home decided to become a pastor.

28.     With this religious conversion and life-changing transformation of his father, Benham grew up witnessing faith in action and the powerful impact it has.

29.     Benham's family has been involved in many wonderful, life-changing activities, but some stand out more than others. One of the highlights was the family's involvement in the conversion of Norma McCorvey—the "Roe" of the infamous *Roe v. Wade* abortion decision—to Christianity. In fact, Benham's father had the privilege of baptizing McCorvey in 1995.

30.     Based on Benham's sincerely held religious beliefs, simply believing that abortion is wrong is not enough. In the Bible, Jesus' brother says "If a brother or sister is without clothing and in need of daily food, and one of you says to them, 'Go in peace, be warmed and be filled,' and yet you do not give them what is necessary for their body, what use is that?" *James* 2:15-16.

31.     Benham was once quoted as saying, and still believes today, that "[c]ompassion without action is not true biblical Christianity. It's just feeling sorry for someone. There's no loving, practical way we can be biblically pro-life and not

do something about it." Ted Allen, *Twin brothers help create a new wave in the pro-life movement*, LIBERTY JOURNAL (Oct. 31, 2019), https://bit.ly/3bd7x7X.

32.     For more than 20 years, Benham and his wife have served together in the pro-life movement.

33.     For Benham, pro-life work is not just charity. It is a Christian duty, an extension of God's command to love one's neighbor.

34.     As part of his work on behalf of unborn babies and their families, Benham co-founded Cities4Life, where he serves as its president and chairman of its board of directors. He also works extensively with Love Life.

35.     Cities4Life and Love Life are entirely separate entities with unique purposes and services. Both, however, offer hope and help to women considering abortion—and those suffering regret after ending their child's life in utero.

**Cities4Life**

36.     Cities4Life is a non-profit, Christian, charitable pro-life ministry, primarily operating in Charlotte, North Carolina.

37.     Cities4Life was incorporated in 2013.

38.     Since 2013, Cities4Life has regularly provided social services outside Charlotte area abortion facilities.

39.     Cities4Life encourages individuals to peacefully and prayerfully demonstrate the love of Jesus Christ outside of abortion facilities and to pray for any needs that people going in or out of the facilities may share with them.

40.     Cities4Life seeks to ensure that women going into abortion clinics are aware of the alternatives to abortion and the social services and other support available to them.

41.     In its years of service, Cities4Life has seen hundreds of women who chose abortion experience devasting guilt and grief.

42.     Without Cities4Life's presence outside abortion facilities, many women would make permanent and irreversible decisions to end their children's lives.

43.     Cities4Life partners with H.E.L.P. Crisis Pregnancy Center to provide a mobile unit outside of abortion facilities in which women can obtain a free sonogram and learn more about the development of their unborn children.

44.     Cities4Life also informs women about, and helps facilitate access to, medical treatments that attempt to reverse chemical abortions that women may regret.

45.     Specifically, many abortions are not surgical, but instead occur by ingestion of abortion-inducing drugs. Doctors have developed a treatment that is often successful in reversing the effects of an abortion-inducing drug

8

(mifepristone, or RU-486) and over 1,000 babies have been saved following this reversal treatment.

46.     Time is of the essence for this reversal treatment, so the presence of Cities4Life outside abortion facilities to consult with women who regret ingesting an abortion-inducing drug is critical.

47.     Cities4Life also provides tangible support to women considering abortion.

48.     Cities4Life provides various social services to women, including: (i) baby showers that deliver tangible materials goods (i.e., diapers, baby furniture, bottles, baby clothes, etc.); (ii) groceries; (iii) money for rent, utilities, vehicles, vehicular repair, gas, prenatal care, wedding services, and follow-up ultrasounds to determine a baby's gender; and (iv) maternity clothes.

49.     Cities4Life also partners with local churches and Gospel-centered ministries in Charlotte to mobilize their faith into actionable steps to meet the physical and spiritual needs of women considering abortion.

50.     For instance, Cities4Life has worked with churches that provide daycare services and secured "scholarships" for women to receive a year of free daycare for their babies if they choose to give birth.

9

**Love Life**

51.     Global Impact Ministries, Inc., operating as Love Life and Love Life Charlotte, is a non-profit, Christian, charitable pro-life ministry.

52.     Love Life offers spiritual counseling, prayer, emotional counseling, referrals for medical treatment to attempt to reverse the effects of an abortion-inducing drug, post-abortion counseling, adoption, foster, and orphan certification training, and a network of partnering area churches that provides material resources to women facing unplanned pregnancies, such as baby clothes, strollers, diapers, cribs, breast pumps, baby equipment, and car seats.

53.     In its years of service, Love Life has seen hundreds of women experience devasting guilt and grief because of an abortion decision.

54.     Without Love Life's presence outside abortion facilities, many women would make permanent and irreversible decisions to end their children's lives.

55.     Love Life offers its ministry in a variety of locations, including Charlotte.

56.     Love Life's purpose is to unite and mobilize the church to create a culture of love and life that will bring an end to abortion and the orphan crisis.

57.     Love Life furthers its mission by providing compassion and hope to young women and men who find themselves facing unplanned pregnancies and by helping and encouraging them to make life-affirming decisions.

58.     Love Life serves as an interface between (i) mothers and fathers who have considered or had an abortion and (ii) the church and all the services local churches can offer when they are organized and mobilized to assist such individuals.

59.     Love Life has partnered with over 300 churches.

60.     Love Life works to ensure that mothers who consider abortion, but then choose life, receive essential social services.

61.     Love Life also works to make sure that interested parents have access to parenting mentorship and adoption-related services.

62.     Love Life also helps women and men experiencing grief, guilt, and regret after an abortion find real hope and understand the forgiveness that Christ offers.

63.     To achieve its goals, Love Life hires personnel to work outside abortion facilities that have Christian sidewalk counselors and to provide counseling themselves in some instances.

64.     Oftentimes, after talking with a sidewalk counselor and perhaps also viewing a free sonogram of her child, a woman will decide she wants to give birth

instead of ending her child's life through abortion. At that point, those interacting with her will frequently connect her with Love Life personnel who can then determine her needs and either meet them directly or use its church partner network to fulfill them.

65.     Additionally, Love Life personnel, along with Christian sidewalk counselors, provide requested counseling to men and women after the abortion procedure is complete. Love Life refers the post-abortive men and women to its church network for ongoing counseling support services.

66.     Separate and apart from the ministry and services that Love Life provides near abortion facilities, Love Life has initiated a multi-year campaign to partner with area churches to inform the churches of the needs men and women have when facing an unplanned pregnancy, the methods by which they can help, and ways churches and Christians can organize to effectively provide help.

67.     Since its inception in 2016, Love Life has regularly provided social services outside Charlotte area abortion facilities.

68.     Love Life has also grown to regularly provide social services outside several other abortion facilities in the State of North Carolina.

69.     Love Life operates its ministry through its staff of approximately 15 individuals working in various roles within the organization and its network of

volunteers, affiliates, and other supporters, primarily from churches throughout North Carolina.

70. Prior to March 20, 2020, Love Life regularly organized prayer walks whereby members of local churches would walk the approximately half-mile circular road on which the abortion facility (A Preferred Women's Health of Charlotte) is located. Each church prayer walker was required to agree and adhere to a very strict code of conduct.

71. The prayer walks seek God's intervention in the hearts of mothers and fathers so they may choose life. The Bible explicitly states and demonstrates on numerous occasions that prayer is a Christian believer's method to speak with God, and that God receives prayer and can answer prayer requests.

72. As of Saturday, March 20, 2020, in response to the COVID-19 virus and CDC recommendations, Love Life ceased all organized prayer walks and told any church partners that if Christians desired to prayer walk individually, they must abide by all CDC social distancing requirements. To fulfill its ongoing non-profit purposes, Love Life's new policy continued to call for paid Love Life personnel to be present at or near abortion facilities that remained open during the pandemic.

73. During this difficult time, Love Life's primary focus is to continue serving as the interface between the church and mothers and fathers considering

abortion. Love Life continues to meet with abortion-minded mothers and fathers, to provide referrals for medical treatment to attempt to reverse the effects of an abortion-inducing drug, and to connect them with partner churches providing counseling, mentoring, education on adoption, foster and orphan care, post-abortion counseling, and material resources.

**Religious motivation**

74.     The Advocates' sincerely held religious beliefs motivate all the pro-life efforts of Benham, Cities4Life, and Love Life.

75.     The Advocates believe that Jesus' transforming love can free people from hopelessness and fear when facing difficult circumstances, such as unplanned pregnancies and difficult economic circumstances.

76.     Many of the individuals the Advocates serve are economically disadvantaged, with little resources, and of the belief that they cannot afford to have and raise a child.

77.     The Advocates believe the Bible teaches that God creates each human being in His image and forms babies in their mothers' wombs, such that from the moment of conception every life is precious and has immeasurable value and worth.

78.    The Advocates sincerely held religious belief is that they are called to care for and support women facing difficult decisions related to unplanned pregnancies.

79.    The Advocates believe that they are religiously obligated to convey and promote the message that from the moment of conception every human life has value and worth.

80.    The Advocates believe that women facing unplanned pregnancies should be respected, encouraged, supported, protected, and provided with emotional, spiritual, and tangible material resources and assistance.

81.    Inspired by the love of Jesus, the Advocates carry out their religious and charitable mission by serving and teaching women about their unique value as human beings made in God's image, the unique and precious lives of babies in the womb, the hope and peace that Jesus Christ offers, and the services available to them.

82.    The Advocates believe that loving, serving, and counseling women in need encourages them to put their faith in Jesus and to free themselves from unhealthy behaviors, destructive relationships and habits, difficult situations, fears, and hopelessness.

**City and County Proclamation**

83.     On March 24, 2020, the Chairman of the Mecklenburg County Board of Commissioners and the Mayor of the City of Charlotte issued a "Revised Joint Proclamation."[1]

84.     A true and correct copy of that Proclamation is attached to this Complaint as Exhibit A.

85.     The Proclamation restricted certain activities while expressly permitting certain other activities to continue.

86.     The Proclamation specified that people may leave their residences for, among other things, "Essential Activities" and "to operate Essential Business."

87.     The Proclamation even "strongly encouraged" all "Essential Businesses" to "remain open."

88.     The Proclamation instructed that, "[t]o the greatest extent feasible," Essential Businesses "shall comply with Social Distancing requirements as defined by CDC."

89.     The Proclamation specified that the CDC recommends that people stay at least six feet apart.

---

[1] The Proclamation states that it "will be valid through April 16, 2020," but that it "may be . . . extended." It was extended until April 29, 2020, and future extensions may occur. *See Stay at Home Order Extended to April 29* (Apr. 16, 2020), https://bit.ly/2KdoEuB.

90.     The Proclamation specified that "[a]ll public and private gatherings of more than 10 people are prohibited, except for the limited purposes permitted by this Proclamation."

91.     Under the Proclamation's terms, the prohibition on gatherings of more than 10 people does not apply to "Essential Activities."

92.     Under the Proclamation's terms, the prohibition on gatherings of more than 10 people does not apply to "Essential Businesses."

93.     The Proclamation lists numerous activities as "Essential Activities."

94.     One "Essential Activity" under the Proclamation is delivering "necessary services or supplies" to others.

95.     Under the Proclamation, those "necessary services or supplies" include, "by way of example only and without limitation, groceries and food, household consumer products, supplies they need to work from home, and products necessary to maintain the safety, sanitation, and essential operation of residences."

96.     Under the Proclamation, "Essential Activity" also includes "engag[ing] in outdoor activity, provided the individuals comply with Social Distancing Requirements, as defined herein, such as, by way of example and without limitation, walking, hiking, golfing, running, cycling, or using the greenways. Individuals may go to public parks and open outdoor recreation areas."

Case 3:20-cv-00232-GCM   Document 1   Filed 04/18/20   Page 17 of 47

97. In addition, under the Proclamation, "Essential Activity" includes "perform[ing] work providing essential products and services at Essential Businesses or Operations."

98. Under the Proclamation, there are numerous "Essential Businesses or Operations."

99. Under the Proclamation, "businesses" include "non-profit" entities.

100. "Essential Businesses or Operations" under the Proclamation include "Human Services Operations," "Organizations that provide charitable and social services," and "Healthcare and Public Health Operations."

101. Under the Proclamation, "Human Services Operations" include "businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged individuals . . . or otherwise needy individuals."

102. The Proclamation specifies that "Human Services Operations shall be construed broadly to avoid any impacts to the delivery of human services, broadly defined."

103. The Proclamation specifies that "Organizations that provide charitable and social services" include "[b]usinesses and religious and secular nonprofit organizations . . . when providing food, shelter, and social services, and other

18

necessities of life for economically disadvantaged or otherwise needy individuals . . . ."

104.   The Proclamation provides that "Healthcare and Public Health Operations" includes "reproductive health care providers" and "public health entities, including those that . . . communicate public health information."

105.   The Proclamation states "Healthcare and Public Health Operations shall be construed broadly to avoid any impacts to the delivery of healthcare, broadly defined."

106.   The Proclamation states that "Social Distancing Requirements includes maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, and not shaking hands."

107.   The Advocates and their activities qualify as "Essential Activity" under the Proclamation.

108.   The Advocates and their activities qualify as "Essential Businesses or Operations" under the Proclamation.

109.   The Advocates and their activities qualify as "Human Services Operations" under the Proclamation.

110.   The Advocates and their activities qualify as "Organizations that provide charitable and social services" under the Proclamation.

111.   The Advocates and their activities qualify as "Healthcare and Public Health Operations" under the Proclamation.

112.   The Advocates regularly wash their hands and ensure the availability of hand sanitizer.

113.   The Advocates  ensure social distancing as set out in the Proclamation, including using sidewalk chalk to mark the sidewalk at intervals of at least six feet.

114.   The Advocates complied with all social distancing requirements.

115.   At all times, the Advocates were and are in full compliance with the Proclamation.

**Arrests and fines targeting disfavored speech and religious exercise**

116.   Six months ago, Benham was quoted in an article as saying of his pro-life work: "When we continue to mobilize with love in our hearts, there's no way our message can be silenced." Ted Allen, *Twin brothers help create a new wave in the pro-life movement*, https://bit.ly/3bd7x7X.

117.   But Charlotte authorities are attempting to do just that—silence the Advocates' message through the exercise of raw, discretionary power, including arrests and fines.

118. The Advocates have long engaged in their ministry and provision of critical services on the sidewalk in the vicinity of A Preferred Women's Health of Charlotte ("Abortion Facility"), the busiest of Charlotte's three abortion facilities.

119. The Abortion Facility is located at 3220 Latrobe Drive in Charlotte.

120. On March 28, counsel for Cities4Life and Love Life was present in the vicinity of the Abortion Facility and confirmed with Major Kornberg of the Charlotte-Mecklenburg Police Department (CMPD) that the activities of Cities4Life and Love Life complied with the Proclamation and the Governor's Executive Order issued on March 27, 2020.

121. Despite this confirmation and the Advocates' full compliance with applicable rules, the CMPD confronted the Advocates on April 4, 2020, on the sidewalk in the vicinity of the Abortion Facility.

122. Between March 28, 2020, and April 4, 2020, the Proclamation was not revised.

123. Between March 28, 2020, and April 4, 2020, the Advocates did not make any material changes to their operations.

124. Upon information and belief, Defendants predetermined that the CMPD would enforce the Proclamation against the Advocates on April 4, 2020, despite the prior confirmation from the CMPD that the Advocates' actions were permissible.

125. Upon information and belief, the CMPD's change of position and decision to unfairly target the Advocates was directed by Defendants.

126. In fact, on March 28, 2020, Julie Eiselt, the Mayor Pro Tem of the City of Charlotte, re-tweeted pictures of the Advocates engaging in social services while social distancing.

127. Through a series of tweets, Eiselt sent messages to the CMPD through the CMPD's Twitter account, asking the CMPD to "please shut this activity down" and then thanking the CMPD "for showing up and hopefully putting an[] end to this."

128. Eiselt further alleged in a tweet that the Advocates are "violating the law" and "should be issued citations if they do not comply with the law."

129. An individual who identified himself in his Twitter profile as a "[p]rofessional storyteller" at WCNC Charlotte, an NBC TV affiliate, responded to a tweet from Eiselt on March 28, 2020, saying "CMPD officer on scene says they are not violating the letter of the stay-at-home order."

130. Upon information and belief, after learning of the CMPD's position, Defendants took action to ensure that the CMPD would change position and no longer allow the Advocates to exercise their First Amendment rights and offer essential services because of the Defendants' hostility to the Advocates' views and beliefs.

131.   Upon information and belief, this pressure from Defendants led to the CMPD taking drastic enforcement action on April 4, 2020.

132.   Upon information and belief, numerous CMPD patrol vehicles arrived in the vicinity of the Abortion Facility on April 4, 2020, at 7:30 a.m., when only approximately five people were present in the vicinity.

133.   At approximately 11:30 a.m. on April 4, 2020, approximately 10 CMPD patrol vehicles and approximately one dozen CMPD officers were present directly in front of the Abortion Facility, where approximately nine people (excluding police officers) were present in the vicinity outside the Abortion Facility.

134.   Meanwhile, scores (if not hundreds) of vehicles were in the parking lot of The Home Depot—and scores (if not hundreds) of people were inside the building—located at one of the intersections that accesses the business park where the Abortion Facility is located.

135.   Upon information and belief, not a single CMPD officer was present at The Home Depot at the time this massive congregation was assembled.

136.   Upon information and belief, the CMPD did not cite or arrest anyone at The Home Depot for violating the Proclamation.

137.   A true and correct image of a portion of the parking lot of that Home Depot as it appeared at approximately 11:45 a.m. on April 4, 2020, is included below.



138.   The CMPD chose to issue citations and/or arrest some of the Advocates on April 4, 2020, in the vicinity of the Abortion Facility, despite the Advocates explaining to the officers that they were in full compliance with applicable requirements.

139.   Benham is not seeking damages or any other relief from this unlawful arrest in this lawsuit.

140.   The CMPD arrested Benham after Benham noted his compliance and the charitable nature of Cities4Life.

141.  At the same time the CMPD was arresting Benham, a woman who had come to the Abortion Facility for an abortion was receiving free services that the Advocates had arranged, including a sonogram, and decided to choose life instead of obtaining an abortion.

142.  The CMPD also arrested and/or cited at least five representatives of Love Life—Robert Reeder, Joshua Kappes, Katherine Burgess, Isaiah Burner, and Luke Surak.

143.  Love Life is not seeking damages or any other relief for the specific unlawful arrest and/or citation of its representatives in this lawsuit.

144.  The Advocates incurred costs as a result of the Proclamation and Defendants' unlawful application of the Proclamation.

145.  For instance, an attorney who performs work for the Advocates and another individual associated with the Advocates drove from Greensboro, North Carolina, to the Abortion Facility in Charlotte, on April 4, 2020, after hearing that the CMPD made arrests. At that time, the attorney communicated with Major Kornberg of the CMPD about the issue.

146.  The Advocates are seeking compensatory damages for costs incurred as a result of the Proclamation and the Defendants' unlawful application of the Proclamation.

147.    The CMPD indicated that the arrests and citations were for allegedly participating in a gathering of more than ten people in violation of the Proclamation.

148.    The CMPD did not indicate that any arrests or citations resulted from any alleged violation of the Governor's Executive Order.

149.    The Advocates were in full compliance with the Governor's Executive Order.

150.    Upon information and belief, nearby parks had more than 10 people present who were not engaged in essential business under the Proclamation and who were not exercising their First Amendment rights.

151.    The CMPD and Defendants have provided no guidance to the Advocates about how they determine which individuals are part of a "gathering" for determining whether a "gathering" exceeds 10 people.

152.    On April 11, 2020, Major Kornberg of the CMPD warned the Advocates that the Proclamation would be enforced on April 18, 2020, differently from its enforcement on April 11, 2020.

153.    Specifically, the CMPD warned the Advocates that, on April 18, 2020 (and thereafter), if there are fewer than 10 Advocates and other individuals subsequently arrive—whether associated with the Advocates or not—the CMPD

can conclude that the "gathering" exceeds 10 people and then punish the people originally present, not the newcomers.

154.   This means that even though the Advocates can gather in groups of more than 10 (with social distancing) because they engage in essential activities and businesses under the Proclamation, if they decide to gather in groups of 10 or less the CMPD may still fine or arrest them if pro-abortion individuals (or others) join the Advocates on the sidewalk.

155.   People unassociated with the Advocates frequently use the sidewalk in the vicinity of the Abortion Facility where the Advocates operate.

156.   Unfortunately, the desire of local government officials to suppress the Advocates' speech and religious exercise comes as no surprise, even though their willingness to openly and flagrantly violate the Advocates' constitutional rights in this particular instance is remarkable.

157.   For years, certain Charlotte government officials have worked to curtail the Advocates' speech, ministry, and religious exercise.

### Jurisdiction and Venue

158.   This action arises under the United States Constitution—particularly the First and Fourteenth Amendments—and under federal statutory law, particularly 42 U.S.C. § 1983.

159. This Court has subject matter jurisdiction over the federal claims by operation of 28 U.S.C. §§ 1331 and 1343.

160. This Court has authority to issue the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, the requested injunctive relief under 28 U.S.C. § 1343, all appropriate monetary damages, including compensatory and nominal, and reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

161. Venue lies in this district pursuant to 28 U.S.C. § 1391(b) because all events giving rise to the claims detailed here occurred within the Western District of North Carolina and Defendants reside in the Western District of North Carolina.

## Allegations of Law

162. At all times relevant to this Complaint, each and every act alleged herein are attributable to Defendants, who acted under color of a statute, regulation, custom, ordinance, or usage of the City of Charlotte and/or Mecklenburg County.

163. Benham, Cities4Life, and Love Life are currently suffering imminent and irreparable harm as a result of Defendants' actions, which violate the Advocates' constitutional rights.

164. The Advocates have no adequate or speedy remedy at law for the loss of their constitutional rights.

165. Unless the Defendants' unlawful enforcement of the Proclamation is enjoined, the Advocates will continue to suffer immediate irreparable injury.

## FIRST CAUSE OF ACTION

### First Amendment: Free Exercise of Religion

166. The Advocates repeat and reallege each allegation contained in paragraphs 1-165 of this Complaint.

167. The First Amendment to the United States Constitution protects the Advocates' rights to operate, speak, provide charitable services, and pray in accordance with their religious beliefs.

168. The Advocates' sincerely held religious beliefs motivate and require them to speak and act in accordance with biblical moral teachings affirming the value and dignity of life at every stage of development, starting from the moment of conception, and to teach and explain those beliefs to the public and those the Advocates serve.

169. The Defendants violate the Advocates' religious beliefs by forcing them (through arrests and fines as well as the threat of such arrests and fines) to refrain from praying for women facing unplanned pregnancies and for the lives of their unborn babies in the general vicinity of those people in need and by preventing the Advocates from providing their charitable services according to their religious beliefs.

170. The Defendants violate the Advocates' religious beliefs by forcing them (through arrests and fines as well as the threat of such arrests and fines) to

refrain from praying and speaking their messages of hope and life and, consequently, from informing others about their religious beliefs and the charitable services that their religious beliefs motivate them to provide.

171.   The Proclamation is neither neutral nor generally applicable on its face because it exempts certain secular activities while prohibiting similar religiously motivated activities, elevating the importance of certain secular activities over the importance of certain religious activities.

172.   Facially and as applied by Defendants, the Proclamation substantially burdens the Advocates' exercise of their sincerely held religious beliefs.

173.   The Proclamation is neither neutral nor generally applicable as interpreted and applied by the Defendants because the Defendants' interpretation and application of the Proclamation is based on hostility toward the Advocates' religious beliefs and pro-life viewpoint.

174.   The Proclamation is neither neutral nor generally applicable as interpreted and applied by Defendants because the Defendants' interpretation and application of the Proclamation targets the Advocates' disfavored religious beliefs and religious practices for punishment.

175.   Defendants are enforcing the Proclamation to interfere with the Advocates' religious expression and practices without any evidence of a compelling need for such an application of the Proclamation and in a way that is not narrowly

or even closely tailored, as evidenced by the fact that at the same time Defendants allow virtually identical conduct—minus the disfavored religious exercise—by others, including those merely engaging in physical exercise.

176.   The First Amendment protects the Advocates' right to believe and profess the religious doctrines of their choice.

177.   The First Amendment prohibits the government from interfering with this right by punishing the profession of a religious belief or imposing special disabilities for stating disfavored religious views.

178.   The Proclamation, facially and as enforced and interpreted by the Defendants, punishes the Advocates' profession of their religious beliefs and the provision of social services based on those beliefs.

179.   As applied against the Advocates, as well as their representatives and affiliates, the Proclamation suppresses their speech based on their religious beliefs.

180.   The Proclamation, therefore, imposes special disabilities on the Advocates due to their profession of disfavored religious beliefs.

181.   The Proclamation also violates the Advocates' free exercise rights under the hybrid rights doctrine because it implicates free exercise rights in conjunction with other constitutional guarantees, like the rights to free speech, expressive association, due process, and equal protection.

182.   The Proclamation burdens the Advocates' sincerely held religious beliefs by banning, deterring, and preventing their religiously motivated speech and conduct.

183.   The Proclamation does not serve any compelling, significant, legitimate, or even valid interests in a narrowly tailored way.

184.   Defendants' targeted and uneven application of the Proclamation restricts the Advocates' fundamental right to exercise their sincerely held religious beliefs, without any real or substantial relation to the public health crisis on which the Proclamation is based.

185.   Defendants' targeted and uneven application of the Proclamation is a pretext for restricting the Advocates' fundamental right to express and act on their sincerely held religious beliefs.

186.   Accordingly, facially and as applied to the Advocates, the Proclamation violates the First Amendment right to free exercise.

## SECOND CAUSE OF ACTION

### First Amendment: Freedom of Speech

187.   The Advocates repeat and reallege each allegation contained in paragraphs 1-165 of this Complaint.

188.   The First Amendment's Free Speech Clause protects the Advocates' rights to speak, to publish speech, to be free from content-based and viewpoint-based

discrimination, to be free from unconstitutional conditions, to be free from laws giving government officials unbridled discretion, and to be free from vague and overbroad laws.

189. If not for the Proclamation and Defendants' interpretation and uneven enforcement of the Proclamation, the Advocates and their agents, including their staff, immediately would engage in unrestricted protected speech, including but not limited to, praying, counseling, and speaking their desired messages in accordance with their organizational mission and outreach services.

190. Instead, the Defendants (through arrests and fines as well as the threat of such arrests and fines) have not only precluded the Advocates from praying and speaking freely about their outreach ministries and services, but they also have prevented the Advocates from discussing freely their own religious beliefs in a public location where it is most likely to reach the vulnerable, economically disadvantaged, and needy individuals they desire to charitably serve.

191. The Advocates have not and will not freely engage in certain protected speech to avoid triggering the Proclamation and Defendants' unconstitutional interpretation and application of the Proclamation as well as incurring further penalties for allegedly violating the Proclamation.

192.  The Advocates are currently suffering ongoing harm because of the Proclamation and Defendants' unconstitutional interpretation and application of the Proclamation.

193.  The Proclamation on its face and as interpreted and applied by Defendants infringes the Advocates' rights under the Free Speech Clause by, among other things, chilling, deterring, and restricting the Advocates' protected speech.

194.  The Proclamation and Defendants' application of the Proclamation is overinclusive, regulating activities with no real or substantial relation to the public health crisis that gave rise to the Proclamation.

195.  The Proclamation and Defendants' application of the Proclamation is underinclusive, allowing activities that, under Defendants' faulty theories, actually may exacerbate the public health crisis and that are less justified than the Advocates' activities.

196.  The Proclamation gives Defendants unbounded discretion to interpret provisions of the Proclamation contrary to the plain meaning of the words and to punish disfavored speech on pregnancy, motherhood, sexuality, abortions, unborn life, and other topics of public concern.

197. This unbridled discretion also exacerbates the problem of the Defendants' engaging in viewpoint-based discrimination, arresting and imposing

fines on the Advocates while allowing others to gather and to express views acceptable to Defendants.

198. Because the Proclamation on its face and as interpreted by Defendants violates free-speech principles for all of the reasons stated above, it must further a compelling interest in a narrowly tailored way.

199. Punishing the Advocates' speech does not serve any legitimate, rational, substantial, or compelling government interest in a narrowly tailored way, and it has no real or substantial relation to the public health crisis underlying the Proclamation.

200. Rather than forcing the Advocates to abandon their free-speech rights, the Defendants have alternative, less restrictive means to achieve any compelling or legitimate interest they may possess.

201. Accordingly, facially and as applied to the Advocates, the Proclamation violates the First Amendment right to free speech.

**THIRD CAUSE OF ACTION**

**<u>Fourteenth Amendment: Procedural Due Process</u>**

202. The Advocates repeat and reallege each allegation contained in paragraphs 1-165 of this Complaint.

203. The Due Process Clause of the Fourteenth Amendment guarantees persons the right to due process of law, which includes the right to be free from vague guidelines that grant unbridled discretion to government officials.

204. The vagueness of the Proclamation on its face, the manner in which Defendants interpret and apply the Proclamation, and the lack of procedural safeguards in the enforcement of Defendants' misinterpretation of the Proclamation violate the Advocates' Fourteenth Amendment right to due process.

205. While the Proclamation expressly permits the Advocates' activities, Defendants are unilaterally determining that the Proclamation does not encompass those activities.

206. The provisions of the Proclamation defining "essential businesses" and "essential activities," which the Advocates contend apply to them, are therefore vague, and the Proclamation does not provide fair notice to the Advocates.

207. For instance, the following terms used in the Proclamation are vague: "necessary services or supplies," "outdoor activity," "essential products and services," "human services operations," "social services," "necessities of life," "charitable and social services," "healthcare and public health operations," "reproductive health care providers," "public health entities," and "delivery of healthcare."

208. The Proclamation is also vague because it does not explain how government officials or individuals are to determine whether there is a "gathering[] of more than 10 people."

209. These provisions of the Proclamation are therefore vague facially and as applied to the Advocates, and do not provide the Advocates fair notice.

210. The CMPD, backed by Defendants, has the power to investigate, interpret, apply, and enforce the Proclamation.

211. Defendants have carte blanche to draft, revise, investigate, interpret, apply, and enforce the Proclamation.

212. As such, the Proclamation is devoid of procedural safeguards to protect against arbitrary enforcement and to provide the Advocates fair notice. In particular, the broad powers given to the CMPD violate the concepts of legal fairness, objectivity, and due process.

213. The Proclamation, facially and as interpreted and applied by Defendants, does not serve any compelling, significant, legitimate, or even valid interest in a narrowly tailored way, because its application to the Advocates bears no real or substantial relation to the public health crisis underlying the Proclamation.

214. Accordingly, facially and as applied to the Advocates, the Proclamation's vagueness, Defendants' arbitrary interpretation of the Proclamation's language, and the facial lack of procedural safeguards allowing for

that misinterpretation, violate the Advocates' Fourteenth Amendment right to due process.

## FOURTH CAUSE OF ACTION

### First Amendment: Freedom of Expressive Association

215.  The Advocates repeat and reallege each allegation contained in paragraphs 1-165 of this Complaint.

216.  The First Amendment protects the right of people to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.

217.  The First Amendment prohibits the government from banning people from associating with others in an expressive association.

218.  The Advocates are expressive associations because people with likeminded beliefs, including those staff and volunteers in the organizations, are joining together to express their religious beliefs about God's creation of life, pregnancy, and motherhood in an effort to assist and serve women and their children in the Charlotte area.

219.  The volunteers and staff associated with the Advocates advance the position that women deserve dignity, respect, and truth when seeking information and counsel about their pregnancy. Forcing the Advocates to refrain from this advocacy (through arrests and fines as well as the threat of such arrests and fines)

38

undermines their ability to collectively advocate their beliefs-based position and to freely associate with the women they seek to associate with.

220. The Advocates likewise engage in expressive association when their staff and volunteers pray together or near one another, while abiding by the Proclamation's edicts (including social distancing). The Defendants forcing the Advocates to refrain from this collective prayer (through arrests and fines as well as the threat of such arrests and fines) undermines the Advocates' ability to freely associate with the volunteers, supporters, and women they seek to associate with.

221. The Advocates also engage in expressive association when their staff and volunteers partner with each other and partner with women seeking information and counsel, teaching them certain biblical values and lessons, and providing them with emotional, spiritual, and material support.

222. In offering free services to those who seek the Advocates' services, the Advocates expressively associate with those women for the purpose of communicating desired messages to those individuals and furthering their mission.

223. One of the reasons that the Advocates associate with women considering abortion is to convey messages consistent with their religious beliefs about God's sovereign creation of life and God's ability to offer hope, peace, and love in all circumstances.

224.   When the Advocates help a woman understand facts about the baby in her womb and become equipped to welcome her baby into the world, they associate with that person, who then becomes an ongoing, living example who communicates the Advocates' views to friends, co-workers, and others.

225.   It is common for people to learn about the services that the Advocates provides from women who have used the Advocates' services.

226.   When people learn that the Advocates assisted a woman facing an unplanned pregnancy, people believe that the services the Advocates provided are consistent with the Advocates' religious beliefs.

227.   By preventing the Advocates from praying and speaking freely, Defendants forbid the Advocates from expressively associating in a way that communicates messages to women and to the community that are consistent the Advocates' desired messages.

228.   Because the Proclamation infringes on the Advocates' expressive association rights, it must further a compelling interest in a narrowly tailored way.

229.   As applied to the Advocates, the Proclamation prevents the Advocates from expressively associating with and thereby conveying messages to the women they seek to serve and to the community.

230.   As applied to the Advocates, the Proclamation does not further any legitimate, rational, substantial, or compelling interest and has no real or substantial relation to the public health crisis underlying the Proclamation.

231.   Defendants have alternative, less restrictive means to achieve any compelling interest they may possess—means that will not force the Advocates to abandon their freedom of expressive association (e.g., permitting the Advocates to associate in accordance with the Proclamation's social distancing requirements).

232.   Accordingly, facially and as applied to the Advocates, the Proclamation violates the Advocates' right to expressive association protected by the Free Speech Clause of the First Amendment.

## FIFTH CAUSE OF ACTION

### Fourteenth Amendment: Equal Protection Clause

233.   The Advocates repeat and reallege each allegation contained in paragraphs 1-165 of this Complaint.

234.   The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees the Advocates equal protection of the laws and prohibits Defendants from treating the Advocates differently from similarly situated persons and organizations.

235.   The government may not treat some individuals or entities disparately as compared to similarly situated persons with respect to the exercise and enjoyment of a fundamental right.

236.   The Proclamation permits individuals—including when more than 10 individuals are in the same general vicinity, like a park or street—to be outdoors walking for exercise while maintaining social distancing.

237.   Defendants have applied the Proclamation to prohibit the Advocates from being in the same public places and in the same manner (maintaining social distancing) if the Advocates are doing so with the purpose of engaging in prayer and religious speech.

238.   Defendants have applied the Proclamation to exempt other organizations providing services—whether charitably or for profit—but have not applied it to exempt the Advocates, who are providing similar or identical services.

239.   For instance, Defendants allow establishments providing groceries to remain open and welcome more than 10 customers in an enclosed store, but Defendants prohibit the Advocates from meeting with people in the open air to help them obtain groceries.

240.   Similarly, Defendants allow entities that provide funds to needy individuals to continue to operate, but punish the Advocates for offering financial help to those struggling to afford basic necessities.

241.   Similarly, Defendants allow entities to provide chemical abortions to women to terminate the lives of their unborn children, but do not allow the Advocates to provide information to women about medical services available to seek to reverse the effects of abortion-inducing drugs and save the lives of their unborn children.

242.   The Defendants' interpretation and application of the Proclamation therefore treats the Advocates, as well as their staff and volunteers, differently from other persons who engage in effectively the same activity as expressly permitted under the Proclamation.

243.   Defendants treat the Advocates differently from other entities and activities exempted under the Proclamation simply because Defendants do not like and disagree with the viewpoint, beliefs, mission, or nature of the Advocates' charitable social services.

244.   Therefore, in its interpretation and application of the Proclamation, Defendants treat similarly situated persons differently based upon a fundamental right.

245.   Defendants lack a rational or compelling state interest for such disparate treatment of the Advocates because prohibiting prayer and religious speech when walking, while at the same time permitting walking in the same location and

manner by those who are not praying or engaging in religious speech, bears no real or substantial relation to the public health crisis underlying the Proclamation.

246. Defendants' disparate treatment of the Advocates is not narrowly tailored because prohibiting the Advocates from praying or speaking in traditional public fora is not the least restrictive means of advancing any compelling or even legitimate interest the government may have regarding the public health crisis.

247. Defendants lack a rational, let alone compelling, state interest for such disparate treatment of the Advocates because prohibiting them from providing charitable social services near abortion facilities, while at the same time permitting other organizations to provide charitable social services, bears no real or substantial relation to the public health crisis underlying the Proclamation.

248. Defendants' disparate treatment of the Advocates is not narrowly tailored because prohibiting the Advocates from providing charitable social services to women near abortion facilities is not the least restrictive means of advancing any compelling or even legitimate interest the government may have regarding the public health crisis.

249. Accordingly, facially and as applied to the Advocates, the Proclamation and Defendants' implementation and enforcement of the Proclamation violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

# PRAYER FOR RELIEF

The Advocates respectfully request that this Court enter judgment against Defendants and provide the Advocates with the following relief:

(A)    A temporary restraining order, preliminary injunction, and permanent injunction to stop Defendants and any person acting in concert with the Defendants from enforcing the Proclamation as applied to the constitutionally protected activities of the Advocates and their officers, agents, staff, and volunteers, including their right to freely speak, pray, and provide charitable social services;

(B)    A declaration that the Proclamation on its face and as interpreted by Defendants violates the United States Constitution's Free Exercise of Religion, Freedom of Speech, Due Process, and Equal Protection Clauses facially and as applied to the constitutionally protected activities of the Advocates and their officers, agents, staff, and volunteers, including their right to freely speak and pray.

(C)    That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter in controversy here so that these declarations shall have the force and effect of a final judgment;

(D)    That this Court award all appropriate damages, including compensatory and nominal, for the Defendants' violation of the Advocates' constitutional and statutory rights;

(E)   That this Court retain jurisdiction of this matter for the purpose of enforcing its orders and that it adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter in this controversy so that these declarations shall have the force and effect of a final judgment;

(F)   That this Court award the Advocates the costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988; and

(G)   That this Court grant any other relief that it deems equitable and just in the circumstances.

Dated this 18th day of April, 2020.    Respectfully submitted,

*s/ Scott W. Gaylord*

Scott W. Gaylord (NC Bar No. 26740)
201 N. Greene Street
Greensboro, NC 27401
(336) 500-9811
sgaylord@elon.edu

Kevin H. Theriot (AZ Bar No. 030446)*
Samuel D. Green (AZ Bar No. 032586)*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (fax)
ktheriot@adflegal.org
sgreen@adflegal.org

David A. Cortman (GA Bar No. 188810)*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville GA 30043
(770) 339-0774
(770) 339-6744 (fax)
dcortman@ADFlegal.org

*Counsel for Plaintiffs*

*Application for special admission or *pro hac vice* admission forthcoming