**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Case No. 3:20-cv-00232**

DAVID BENHAM; CITIES4LIFE; GLOBAL
IMPACT MINISTRIES d/b/a LOVE LIFE; and
LOVE LIFE CHARLOTTE,

        Plaintiffs,

    v.

CITY OF CHARLOTTE, NORTH
CAROLINA; and MECKLENBURG COUNTY,
NORTH CAROLINA,

        Defendants.

**DEFENDANT MECKLENBURG COUNTY'S**
**MEMORANDUM**
**IN SUPPORT OF ITS**
**<u>MOTION TO DISMISS COMPLAINT</u>**

# INTRODUCTION

The COVID-19 pandemic created a state, national, and global emergency without any modern parallel. Like numerous other local and state governments across the country, Defendants Mecklenburg County (the "County") and the City of Charlotte (the "City") addressed this public health crisis by implementing measures (in the form of a Joint Proclamation)[1] to slow the spread of this deadly disease through *temporary* restrictions on non-essential business activities and gatherings of more than 10 people (the "Gatherings Limitation").

The express purpose of the Joint Proclamation was to protect public health and safety in Mecklenburg County. The Joint Proclamation, which has since been rescinded, followed guidance from the Centers for Disease Control and Prevention, and applied equally to religious and secular activities. Despite the compelling and unprecedented threats to public safety underlying the Joint Proclamation's restrictions, Plaintiffs continued to gather in groups of more than 10 people outside A Preferred Women's Health Center on Latrobe Drive in Charlotte. Their purpose was not to provide any essential service as defined in the Joint Proclamation, but rather to—in their own words— "advocate" against abortion and to counsel Women's Health Center patients in an effort to persuade them not to seek abortions. The Charlotte-Mecklenburg Police Department ("CMPD") arrested or issued citations to Advocates who refused to leave the area around the Women's Health Center on April 4, 2020, after being warned that they were violating the Joint Proclamation. Plaintiffs now complain that the Joint Proclamation was unconstitutional on its face or as applied to their activities outside the Women's Health Center.

As explained herein, Plaintiffs' claims should be dismissed because: (1) the Joint Proclamation was constitutional on its face; (2) the alleged acts of CMPD cannot be imputed to the County because CMPD operates under the City's control; and (3) in any case, the Joint Proclamation was not applied

---

[1] *See* Revised Joint Proclamation. (Am. Compl., Ex. A).

in an unconstitutional manner to Plaintiffs.

## BACKGROUND

Plaintiffs allege that CMPD arrested or cited Plaintiff David Benham and members of Plaintiffs Cities4Life and LoveLife were on April 4, 2020, for violating the Joint Proclamation's Gatherings Limitation. Although Plaintiffs allege that Cities4Life and LoveLife sometimes provide sonograms to dissuade women from obtaining abortions, as well as "counseling" services, they do not allege that they were engaged in these activities when they were arrested, but instead were gathered on a sidewalk outside the abortion clinic "praying for and offering hope and tangible support" to women entering and leaving the clinic. (Am. Compl. ¶ 4).

## STANDARD OF REVIEW

"Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *McClean v. U.S.*, 566 F.3d 391, 399 (4th Cir. 2009). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient allegations of fact that, if accepted as true, "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Moreover, the Court need not accept as true legal conclusions, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, a complaint may survive a motion to dismiss only if it "permit[s] the court to infer more than the mere possibility of misconduct" based upon "its judicial experience and common sense." *Id.* at 679

## ARGUMENT

## I.   PLAINTIFFS' VARIOUS FACIAL CHALLENGES TO THE JOINT PROCLAMATION FAIL AS A MATTER OF LAW.

As the Supreme Court has repeatedly warned, "[a] facial challenge to a legislative act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no

set of circumstances exists under which the act would be valid." *U.S. v. Salerno*, 481 U.S. 739, 745 (1987). Plaintiffs' allegations fail to satisfy that rigorous standard. The plain text of the Joint Proclamation itself reveals that its Gathering Limitation is a neutral, generally applicable restriction on conduct, not speech, and thus a lawful exercise of the government's police power.

### A. The Amended Complaint's Alleged Events Occurred Less Than One Month After the First Declaration of an Emergency in North Carolina for Covid-19.

In assessing the facial constitutionality of the Joint Proclamation, it is critical to consider the timing and context of its enactment. In a matter of days in early March of 2020, life in the United States took a sudden and dramatic turn. Public officials immediately scrambled to devise strategies to protect public health with only limited information available to guide them. As noted in the Joint Proclamation, the Governor of North Carolina declared a state of emergency on March 10. Then on March 13, the City, the County, and six towns within the County signed a Joint Declaration of Emergency.

The United States Supreme Court has long recognized that the constitution affords latitude to local and state governments to restrain certain liberties to protect public safety in the face of great danger. *See Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905) (affirming the constitutionality of a Massachusetts statute mandating smallpox vaccinations). As *Jacobson* explained:

> [I]n every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand.

197 U.S. at 29; *see also Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944) ("The right to practice religion freely does not include liberty to expose the community . . . to communicable disease[.]"). This same reasoning applies here. Like the statute at issue in *Jacobson* the Joint Proclamation did not single out any protected activity for regulation, and it represented an emergency measure with a substantial relation to a public health crisis. Just 10 days ago, the Southern District of New York held certain

3

executive orders issued in May of 2020 to be constitutional, applying *Jacobson's* standard "that a state or local law 'enacted to protect the public health' will survive judicial scrutiny unless it bears 'no real or substantial relation to [the public health], or is, beyond all question a plain, palpable invasion of rights secured by the fundamental law.'" *Geller v. Hochul*, 2021 WL 4392521 at *8 (S.D.N.Y. Sept. 24, 2021) (quoting *Jacobson*, 197 U.S. at 31).

Consistent with Jacobson, and as discussed in greater detail, *infra,* the Courts gave great deference to state and local governments' initial attempts to contain the spread of the Covid-19 virus. *See, e.g. S. Bay United Pentecostal Church v Newsom*, 140 S. Ct. 1613 (2020) ("*S. Bay I*") (denying, on May 29, 2020, application to enjoin California's gathering limitation because, *inter alia*, shopping for necessary supplies involves fleeting encounters that do not raise same public interest concerns as extended gatherings); *Calvary Chapel Dayton Valley v. Sisolak,* 140 S.Ct. 2603 (2020) (declining, on July 24, 2020, to enjoin Nevada directive, which permitted casinos, bowling alleys, breweries, and fitness facilities to operate at 50% capacity while restricting religious gatherings to 50 persons); *Antietam Battlefield KOA v. Hogan*, No. CV CCB-20-1130, 2020 WL 2556496, at *8–9 (D. Md. May 20, 2020) (denying preliminary injunctive relief in pastors' challenge to Maryland order prohibiting gatherings of more than 10 people because the order applied to gatherings "without regard to whether that conduct is religiously motivated or not"); *Lighthouse Fellowship Church v. Northam*, No. 2:20-CV-204 2020 WL 2110416at *6–7 (May 1, 2020) (denying motion to enjoin Virginia's order prohibiting gatherings of more than 10 people as a neutral, generally applicable regulation).

As time has passed, and our understanding of Covid 19 has increased, the level of judicial deference to ongoing state and local restrictions has decreased. More recent challenges have found courts increasingly willing to enjoin enforcement of Covid-related restrictions on gatherings that have extended well beyond the initial days of the pandemic, particularly with respect to restrictions in New

4

York and California that specifically target religious activities.[2] *See, e.g. Tandon v. Newsom,* 141 S.C.t 1294 (2021) (enjoining enforcement of California's restrictions on private at-home worship gatherings); *South Bay United Pentecostal Church v. Newsom,* 141 S.Ct. 716 (2021) ("*S. Bay II*") (enjoining enforcement of California's "Blueprint Tier 1" prohibition on indoor worship services, but declining to enjoin enforcement of the capacity limitation and prohibition on singing and chanting during indoor services); *Roman Catholic Diocese of Brooklyn v. Cuomo,* 141 S.Ct. 63 (2020) (enjoining the enforcement of 10 and 25 person occupancy limits that specifically targeted houses of worship); *Agudath Israel of America v. Cuomo,* 141 S.Ct. 889 (2020) (same).

However, even the justices who expressed the greatest opposition to continued Covid-related restrictions that expressly target religious activities have recognized that emergency measures in the spring of 2020 must be viewed through a different lens. In his dissent to the Court's decision not to enjoin Nevada's directive in July of 2020, Justice Alito specifically acknowledged:

> In times of crisis, public officials must respond quickly and decisively to evolving and uncertain situations. At the dawn of an emergency—and the opening days of the COVID–19 outbreak plainly qualify—public officials may not be able to craft precisely tailored rules. Time, information, and expertise may be in short supply, and those responsible for enforcement may lack the resources needed to administer rules that draw fine distinctions. Thus, at the outset of an emergency, it may be appropriate for courts to tolerate very blunt rules. In general, that is what has happened thus far during the COVID–19 pandemic.

*Calvary Chapel,* 140 S.Ct. at 2605. Similarly, in his concurrence to the *Roman Catholic Diocese of Brooklyn* decision, Justice Gorsuch noted:

> [In *S. Bay I*] THE CHIEF JUSTICE expressed willingness to defer to executive orders in the pandemic's early stages based on the newness of the emergency and how little was then known about the disease. At that time, COVID had been with us, in earnest, for just three months. Now, as we round out 2020 and face the prospect of entering a second calendar year living in the pandemic's shadow, that rationale has expired according to its own terms.

---

[2] The Joint Proclamation did not single out religious activities for less favorable treatment. It was also temporary in nature and superseded by a new Proclamation that included religious activities as essential businesses and activities on April 30, 2020, barely three weeks after Plaintiffs' arrest. *See* https://www.mecknc.gov/news/Pages/County-Transitions-to-States-Stay-at-Home-Order.aspx.

*Roman Catholic Diocese*, 141 S.Ct. at 70.

This Court's review of the Joint Proclamation should thus be mindful of the significant distinction between the circumstances as they existed when the Joint Proclamation was adopted in March 2020 and the circumstances today. As Chief Justice Roberts noted in *S.Bay I*, more than two months after the Joint Proclamation:

> At this time, there is no known cure, no effective treatment, and no vaccine. Because people may be infected but asymptomatic, they may unwittingly infect others. The Order places temporary numerical restrictions on public gatherings to address this extraordinary healthy emergency.

140 S.Ct. at 1613. These were the circumstances facing the local governments in Mecklenburg County in March 2020. As noted in the Joint Proclamation, widespread testing for Covid-19 was not yet even available at the time. The adoption of the Joint Proclamation, and the arrest of Plaintiffs on April 4, 2020, truly occurred at the "dawn of an emergency."[3]

Against that backdrop, the Joint Proclamation was a lawful exercise of governmental authority in response to an emergency and was constitutional on its face.

### B. The Joint Proclamation Did Not Violate Plaintiffs' Right to Free Exercise of Religion.

It is well-established that neutral laws of general application, such as the Joint Proclamation's 10-person Gathering Limitation, do not violate the Free Exercise Clause merely because they impose an incidental burden on a plaintiff's religious practices. As the Fourth Circuit has explained, "*the Clause does not compel Congress to exempt religious practices from a valid and neutral law of general applicability . . . even if such a law has the incidental effect of burdening a particular religious practice.*" *Liberty Univ., Inc. v. Lew*, 733 F.3d

---

[3] Indeed, at the time of Plaintiffs' arrest, an order was in effect in this judicial district continuing all criminal jury trials scheduled to begin between April 1, 2020 and June 1, 2020, reasoning that, "The Court finds the increasingly stringent responses from various branches and levels of government, to include the statewide 'stay home' orders, as well as the growing number of COVID-19 cases confirmed within this District, and the ongoing recommendations from health officials regarding the immediate need to limit gatherings and person-to-person contact, *mandate swift action to protect the public health and outweighs the rights of the impacted defendants, and the public, to a speedy trial.*" Exhibit A (emphasis added). Likewise, the Fourth Circuit closed the Powell Courthouse to the public. Exhibit B.

72, 99 (4th Cir. 2013) (emphasis added). "A neutral law of general applicability thus does not violate the Free Exercise Clause." *Id.* Instead, such laws are presumed to be constitutional and are subject only to rational basis review. *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cty., Maryland*, 915 F.3d 256, 265 (4th Cir. 2019). Under rational basis review,

> the plaintiffs' claims challenging the constitutionality of [a government act] must fail if the [act] is even plausibly related to the Government's stated objective . . .. The [act] must be afforded a strong presumption of validity, and those attacking the rationality of the policy have the burden to negat[e] *every conceivable basis* which might support it. Moreover, under the deferential standard, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction *actually motivated* the decisionmaker. When the rational basis review standard is applicable, the Supreme Court . . . hardly ever strikes down a policy as illegitimate.

*Int'l Refugee Assistance Project v. Trump*, No. 19-1990, 2020 WL 3039029, at *11 (4th Cir. June 8, 2020) (internal quotation marks and citations omitted) (emphasis original).

The Joint Proclamation's 10-person Gathering Limitation is both neutral and generally applicable, which meets the requirements for rational basis review. "A law is considered neutral if it proscribes conduct without regard to whether that conduct is religiously motivated or not." *Hines v. S.C. Dep't of Corr.*, 148 F.3d 353, 357 (4th Cir. 1998). Similarly, a law is considered generally applicable unless it "impose[s] burdens only on conduct motivated by religious belief." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993).

As noted above, the most useful guidance in assessing the facial constitutionality of the Joint Proclamation can be found in other decisions assessing similar (and even more restrictive) limitations imposed in the months immediately following the outbreak of Covid-19 in the United States. In *S. Bay I* Chief Justice Roberts explained that the type of fleeting encounters that occur when people go to stores to obtain necessary supplies do not raise the same public health concerns as gatherings where people are likely to stay in close proximity for extended periods:

Although California's guidelines place restrictions on places of worship, those restrictions appear consistent with the Free Exercise Clause of the First Amendment. Similar or more severe restrictions apply to comparable secular gatherings, including lectures, concerts, movie showings, spectator sports, and theatrical performances, where large groups of people gather in close proximity for extended periods of time. And the Order exempts or treats more leniently only dissimilar activities, such as operating grocery stores, banks, and laundromats, in which people neither congregate in large groups nor remain in close proximity for extended periods.

140 S. Ct. at 1613.

In *Calvary Chapel*, the Supreme Court even declined to enjoin Nevada's directive, which—unlike the Joint Proclamation—(1) specifically singled out religious activities for different treatment than certain secular activities; and (2) included recreation and entertainment such as gambling, bowling, fitness facilities, and breweries within the indoor activities that could operate at 50% capacity while limiting religious activities to 50 persons regardless of capacity. 140 S.Ct. 2603. Even so, the Court deferred to local officials' discretion during the initial months of the pandemic and denied the petition for injunctive relief.

Similarly, in the months immediately following the outbreak of Covid, two district courts in this Circuit rejected challenges to COVID-19 orders that were premised, in part, on arguments that exceptions for "Essential Businesses" somehow render the orders underinclusive. In *Antietam*, the court specifically concluded that the order was generally applicable because—like the Joint Proclamation—it prohibited gatherings for "secular activities analogous to religious services at least with respect to the type of interactions," such as movie theaters and sporting events where people congregate for extended periods, while carving out exceptions only for essential businesses engaged in the sale of items "necessary for everyday life" or to help mitigate the pandemic. 2020 WL 2556496, at *8-9. Likewise, the *Lighthouse* court rejected the plaintiff's contention that the order was underinclusive because it included exceptions for certain essential activities, such as going to the store to buy necessities. The court concluded such activities bore "little similarity to large religious worship services." 2020 WL 2110416, at *6-7. It explained that imposing the ten-person restriction "on

8

essential businesses would threaten adequate access to food, water, medicine, and other goods and services necessary to keep individuals alive and functioning during this pandemic." *Id.* at *7. On the other hand, even though "practicing one's religion and obtaining spiritual guidance are essential for some people," there was no reason the plaintiff could not "practice its religion or provid[e] spiritual guidance to its members in groups of ten or fewer." *Id.* at *8.

Here, Plaintiffs' facial challenge depends on the same reasoning that *South Bay*, *Antietam*, and *Lighthouse* rejected. They claim the Joint Proclamation's Gathering Limitation was "neither neutral nor generally applicable on its face because it exempts certain secular activities while prohibiting similar religiously motivated activities, elevating the importance of certain secular activities over the importance of certain religious activities." (Am. Compl. ¶ 185). But the text of the Joint Proclamation itself reveals that this is not so. The Joint Proclamation did not target religious activities, nor did it allow secular activities similar to those engaged in by Plaintiffs.

Instead, the Joint Proclamation's Gathering Restriction was a neutral conduct regulation that prohibited "all public and private gatherings of more than 10 people" except to engage in the "Essential Activities" listed in the Proclamation.[4] The Joint Proclamation's list of Essential Activities made no distinction between secular and religious gatherings, made no distinction between gatherings for the purpose of expressing a viewpoint and gatherings with no expressive purpose at all, and contained no prohibition against gatherings based on the content of any expression at such gatherings. The Proclamation's restrictions applied to social gatherings, business meetings, and the operation of any non-essential business in exactly the same way that it applied to Plaintiffs' activities. The Joint

---

[4] The Gathering Restriction provides:

> <u>Prohibited activities</u>. All public and private gatherings of more than 10 people are prohibited, except for the limited purposes permitted by this Proclamation. Nothing herein prohibits the gathering of members of a household or residence.

(Am. Compl., Ex. A at 4).

Proclamation is thus readily distinguishable from orders struck down in other cases, because it did not include any provision singling out religious gatherings or expressive conduct for different treatment.[5]

To the extent that Plaintiffs offer any basis at all for their contention that the Proclamation targeted religious activity, they contend that the Proclamation was deficient because it contained exceptions for secular activities while prohibiting allegedly similar religious activities. Plaintiffs incorrectly contend that shopping at Home Depot or walking in a nearby park are sufficiently similar to their sidewalk protests outside the Women's Health Center that the Proclamation cannot be considered a neutral or generally applicable regulation.

Plaintiffs nevertheless argue that the Joint Proclamation was underinclusive because it included exceptions for "Essential Businesses" that allowed residents to go to Home Depot to buy necessary supplies. This exception does not evidence an attempt to target religious activities, because the activities at issue are fundamentally distinct. 2020 WL 2556496 at *8 (collecting cases) (holding that exceptions allowing residents to go to Lowe's and Walmart, but prohibiting in-person gatherings for secular or religious purposes, did not render Maryland order underinclusive).

Plaintiffs also point to a nearby park and erroneously allege—contrary to the language of the Joint Proclamation attached to the Complaint—that the proclamation allows "gatherings" of more than 10 people for outdoor exercise. (Am. Compl. ¶ 257). The plain text of the Joint Proclamation, however, provided only that "*individuals* may leave their residence . . . [t]o engage in outdoor activity . . .." (Am. Compl. Ex. A, p.6 (emphasis added)). It further provided, "*Individuals* may go to public parks and open outdoor recreation areas." (*Id.* (emphasis added)). Thus, while the Joint Proclamation allowed *individuals* to travel to outdoor areas to engage in exercise, it did not allow *gatherings* of more

---

[5] Even if Plaintiffs could argue that the Joint Proclamation failed to make sufficient exception for worship services or other religious activities, it doubtful that they would have standing to assert such a claim. Plaintiffs do not allege that they were engaged in worship services, or complain that they were arrested because the Joint Proclamation failed to include exceptions for those services, and thus fail to show an injury fairly traceable to such a theory.

than 10 people to engage in outdoor activity. *See Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir.1991) ("[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . ., the exhibit prevails.").

The Joint Proclamation did not target or burden only religious activity, but instead applied to gatherings of any type—including comparable secular activities. Its only exceptions concerned activities that were viewed at the time as not raising the same public health concerns and are therefore distinguishable from the types of conduct prohibited by the Joint Proclamation.

### C. The Joint Proclamation Did Not Violate Plaintiffs' Right to Freedom of Speech.

Plaintiffs' facial challenge under the Free Speech Clause fails for similar reasons as their Free Exercise Claim. The Joint Proclamation did not attempt to restrict speech or expressive conduct, but instead prohibited all gatherings of 10 or more people regardless as to whether the gathering was for an expressive purpose. And even if it were a restriction on speech, the Joint Proclamation's Gathering Limitation would have been a valid time, place, and manner restriction.

#### 1. The Joint Proclamation Did Not Restrict Speech.

The text of the Joint Proclamation's Gathering Limitation restricted conduct, not speech. The Supreme Court has "rejected the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Texas v. Johnson*, 491 U.S. 397, 403-04 (1989). Accordingly, where the face of a regulation governs only conduct, and does not attempt to regulate speech or expressive activity, the First Amendment does not apply because the First Amendment does not protect conduct. *Id.* As the court held in *Lighthouse,* the Gathering Limitation does not "restrict expressive conduct that falls within the protections of the First Amendment's guarantee of freedom of speech" because there is no "expressive element" to gathering in a group of 10 people. 2020 WL 2110416, at *11 (holding that gathering in groups of 10 or more, by itself, does not possess sufficient communicative elements to warrant freedom of speech protection under the First Amendment). The court in *Lighthouse* also held that, even if the order

11

restricting gatherings affected expressive conduct, it would still satisfy the test established in *U.S. v. O'Brien*, 391 U.S. 367, 377 (1968) for assessing government regulations that apply on their face to expressive conduct because it was authorized by state law, served a substantial government interest, and was "no greater than that which is essential to further the interests of slowing the spread of a deadly pandemic and preserving human life." *Id.* at *12 (noting that "preservation of existing human life must be a governmental interest of the highest order").

The same is true here. The Joint Proclamation limited gatherings to 10 people or more—it did not limit speech. And the mere act of gathering in a group of more than 10 people is not sufficiently imbued with elements of communication to be considered expressive conduct. But even if the Gathering Limitation were construed to regulate expressive conduct, the *O'Brien* test would be satisfied. The Joint Proclamation was authorized under North Carolina Emergency Management Act. *See* N.C. Gen. Stat. § 166A-19.31. It also furthered an unquestionably substantial governmental interest—thwarting the spread of a deadly pandemic—which is unrelated to the suppression of expression. Finally, because COVID-19 spreads through interpersonal interaction, the restriction on gatherings of more than 10 people was essential to stopping its spread.

### 2. Even If the Joint Proclamation Restricted Speech, It Would Have Been a Valid Time, Place and Manner Restriction.

Going further, even if the Joint Proclamation were viewed as a restriction on speech itself (which it was not), it would still have been a lawful time, place, and manner restriction.

"[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l. Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640, 647 (1981). Rather, "the government may impose reasonable restrictions on the time, place, or manner of protected speech . . .." *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989). Time, place, or manner restrictions on protected speech are reasonable when the restrictions "are justified without reference to the content of the regulated speech, . . . narrowly tailored to serve a significant

governmental interest, and . . . leave open ample alternative channels for communication of the information." *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293 (1984). "The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration." *Ward*, 491 U.S. at 791. "[T]he requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* at 799. To satisfy the alternative channels standard, "the available alternatives need not be the speaker's first or best choice or provide the same audience or impact for the speech. Rather, the relevant inquiry is simply whether the challenged regulation provides avenues for the more general dissemination of a message." *Ross v. Early*, 746 F.3d 546, 559 (4th Cir. 2014).

Again, the decisions from courts reviewing similar COVID-19 orders are instructive. In *Antietam* the court held prohibiting gatherings of 10 or more is a content-neutral time, place, and manner restriction, narrowly tailored to thwart the spread of COVID-19. Rather than regulating speech based on its content, the orders "regulate[] the time and manner in which speech can be expressed . . . no matter the purpose for the gathering or the type of speech the gathering wishes to express." *Antietam*, 2020 WL 2556496, at *10. The restriction on gatherings was also narrowly tailored because "[r]educing the spread of COVID-19 is a legitimate and substantial government interest" and eliminating the restriction would be less effective in advancing the interest "[b]ecause of the ease with which COVID-19 spreads" and the potential for it to spread through asymptomatic individuals. *Id.* at *11. The order was also limited to "the duration of the public health emergency." *Id.* at *10. In addition, the progressive increase in restricting gatherings to 50 people at first, and then to 10 people only after infections continued to rise "demonstrate[d] a gradual tailoring of the prohibition." *Id.* Finally, the order left "open ample alternative channels for communication" in "view of the COVID-19 context" because the plaintiffs could still gather in groups of ten or fewer, and could "also communicate information in other ways such as through the Internet, newspaper, or signs." *Id.* at *12.

13

As a result, *Antietam*, like *Lighthouse*, found that the plaintiffs did not demonstrate a likelihood of success on their Freedom of Speech claim. *Id.* at \*13; *see also Benner v. Wolf*, No. 20-CV-775, 2020 WL 2564920, at \*7 (M.D. Pa. May 21, 2020) (same as *Antietam*); *Givens v. Newsom*, No. 2:20-CV-00852-JAM-CKD, 2020 WL 2307224, at \*7 (E.D. Cal. May 8, 2020) (finding that plaintiffs were unlikely to succeed on free speech claim challenging prohibition on permits for all in-person gatherings at the State Capitol during the pandemic).

As in *Antietam*, the Joint Proclamation was, at most, a content-neutral, time, place, and manner restriction, since it restricted gatherings of more than 10 people regardless of the content—or even the existence—of speech at the gathering. It was also narrowly tailored since it was designed to prevent the spread of a deadly pandemic, and allowing people to congregate in groups of more than 10 people would have been less effective at accomplishing the same objective. Finally, as discussed above, the Joint Proclamation left Plaintiffs ample alternatives to express their views by gathering in groups of 10 or fewer people or promoting their beliefs through the Internet, newspaper, signs, and other available media. Accordingly, the Court should dismiss Plaintiffs' Freedom of Speech claim.

### D. The Joint Proclamation Did Not Violate Plaintiffs' Right to Expressive Association.

Plaintiffs' "Expressive Association" claim fails for the same reasons as their Free Speech claim. Expressive association is defined as the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Iota Xi Chapter Of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 146 (4th Cir. 2009). "The right to associate for expressive purposes is not, however, absolute. Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984). In other words, the *O'Brien* test also applies to expressive association claims.

14

Numerous courts have rejected claims that gathering limitations issued in response to Covid-19 somehow violate plaintiffs' rights to expressive association. *See, e.g.*, *Six v. Newsom*, No. 8:20-CV-00877-JLS-DFM, 2020 WL 2896543, at *7 (C.D. Cal. May 22, 2020); *Benner*, 2020 WL 2564920, at *8; *SH3 Health Consulting, LLC v. Page*, No. 4:20-CV-00605 SRC, 2020 WL 2308444, at *8 (E.D. Mo. May 8, 2020); *Legacy Church, Inc. v. Kunkel*, No. CIV 20-0327 JB\SCY, 2020 WL 1905586, at *40 (D.N.M. Apr. 17, 2020). Underpinning these cases is a recognition that restricting large gatherings does not prevent plaintiffs from engaging in expressive association through other means, such as electronic platforms "like Zoom, Microsoft Teams, Google Hangouts, and the like," *Six*, 2020 WL 2896543, at *7, as well as "social media, email, blogs, and telephones." *Page*, 2020 WL 230844, at *8.

The Joint Proclamation did not prohibit Plaintiffs from associating; it only prohibited them from gathering *in person, in groups of more than 10 people*. Plaintiffs were free to engage in expressive association, however, either in groups of 10 or fewer, or through a myriad of other methods.

### E. The Joint Proclamation Did Not Violate Plaintiffs' Right to Due Process.

Plaintiffs rest their Due Process claims on two arguments, contending (i) that the Joint Proclamation was unconstitutionally vague, or (ii) that it does not include sufficient "procedural safeguards" such as a right to a hearing to interpret the Joint Proclamation before it is enforced. Neither argument withstands scrutiny.

### 1. The Joint Proclamation is Not Void for Vagueness.

"To survive a vagueness challenge, a statute must give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019). Accordingly, a plaintiff "'must demonstrate that the law is *impermissibly vague in all of its applications*' and must 'prove that the enactment is vague not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense *that no standard of conduct is specified at all.*'" *Shook v. City of Lincolnton, NC*, No. 5:18-CV-00193-KDB-

DCK, 2019 WL 4145709, at *4 (W.D.N.C. Aug. 29, 2019) (emphasis added) (quoting *Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 497 and 495, n. 7 (1982)). "[P]erfect clarity and precise guidance have never been required." *Ward,* 491 U.S. at 794. Thus, courts cannot "declar[e] a statute vague simply because it does not include the most elaborate or the most specific definitions possible. The test for vagueness 'is necessarily a practical rather than hypertechnical one.'" *U.S. v. Shrader*, 675 F.3d 300, 310 (4th Cir. 2012) (quoting *U.S. v. Biocic,* 928 F.2d 112, 114 (4th Cir.1991)).

Courts have consistently rejected vagueness challenges to orders like the Joint Proclamation. *See Butler v. City of New York,* No. 20 CIV. 4067 (ER), 2021 WL 4084501, at *10–11 (S.D.N.Y. Sept. 8, 2021) (rejecting vagueness challenge to order restricting "non-essential gatherings" because the order provided "an extensive list of what constitutes 'essential'" and a "person of reasonable intelligence would know that anything not identified as 'essential' was 'non-essential.'"); *Case v. Ivey*, No. 2:20-CV-777-WKW, 2021 WL 2210589, at *13–14 (M.D. Ala. June 1, 2021) (rejecting vagueness challenge to order limiting religious gatherings to events with fewer than ten people because, while "[t]here may be other constitutional problems with this aspect of the orders, . . . vagueness [was] not one of them given that the language "plainly delineated what conduct was proscribed") *Hartman v. Acton*, No. 2:20-CV-1952, 2020 WL 1932896, at *1, 5 (S.D. Ohio Apr. 21, 2020) (rejecting challenge prohibiting operation of all but essential businesses, holding that the order "provides clear and fair warning of what conduct is proscribed" because it "makes clear that all businesses, except essential businesses as defined in the Order, must cease during the applicable time period").

As in *Butler, Case,* and *Hartman*, Plaintiffs here allege that the Joint Proclamation's provisions "defining 'essential businesses' and essential activities'" are vague and that they do not provide fair notice to Plaintiffs. (Am. Compl. ¶ 225). But the Joint Proclamation spends more than six single-spaced pages defining "essential businesses" and "essential activities," and specifically lists businesses that fall under these terms. Under a practical analysis, the Joint Proclamation's use of "essential businesses" and "essential activities" gave Plaintiffs sufficient notice of the conduct it prohibited.

16

Plaintiffs also assert that the Joint Proclamation was vague because it did not explain how individuals should evaluate "whether there is a gathering of more than 10 people." (Am. Compl. ¶ 227). But a gathering of 10 or more people can be easily identified by a regular person exercising common sense. *See Shrader, supra* (applying a practical, rather than hypertechnical, standard to assessing vagueness). Indeed, despite the proliferation of prohibitions on gatherings of more than 10 people across the country, the County has not identified a single case holding that such a prohibition is void for vagueness because it did not explain how to count the people gathered.

Plaintiffs are actually demanding "[p]erfect clarity and precise guidance," which the Supreme Court has held are not required. *See Ward,* 491 U.S. at 791. For instance, Plaintiffs cherry pick phrases such as "social services" and "necessities of life" from the Joint Proclamation's definition of "Human Service Operations"—which itself is just one of a number of "Essential Activities." (Am. Compl. ¶ 226). A review of the full definition, however, reveals that these phrases are understandable when read in light of their everyday meaning, and in the context of the definition as a whole:

> Human Services Operations include, but [are] not limited to: long-term care facilities; residential settings and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness; transitional facilities; home-based settings to provide services to individuals with physical, intellectual, and/or developmental disabilities, seniors, adults, and children; field offices that provide and help to determine eligibility for basic needs including food, cash assistance, medical coverage, child care, vocational services, rehabilitation services; developmental centers; adoption agencies; *businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged individuals, individuals with physical, intellectual, and/or developmental disabilities, or otherwise needy individuals.*
>
> Human Services Operations shall be construed broadly to avoid any impacts to the delivery of human services, broadly defined.

(Am. Compl., Ex. A at 7-8 (emphasis added)). Just because Plaintiffs have sued to challenge the Joint Proclamation, or profess not to understand the way certain terms are defined, does not render them unconstitutionally vague. It would be impossible to define every word and phrase in the Joint Proclamation, and the Constitution does not require Defendants to do so. Plaintiffs received ample

notice of what they had to do in order to comply with the Joint Proclamation.

### 2. The Joint Proclamation Provides Sufficient Procedural Safeguards in Light of the Emergency Posed by the COVID-19 Pandemic.

Plaintiffs' contentions that the Joint Proclamation—which was issued in response to an ongoing, public *emergency*—should have included "procedural safeguards," such as pre-enforcement hearings, is similarly devoid of merit. Governments have authority "to enact quarantine laws and health laws of every description" under their police power. *Jacobson*, 197 U.S. at 25. While it is true that due process generally requires a hearing before a deprivation of a property or liberty interest occurs, *a hearing is not required when the government action at issue is a generally applicable law or order. See, e.g.*, *Neinast v. Bd. of Trustees of Columbus Metro. Library*, 346 F.3d 585, 596–97 (6th Cir. 2003) ("Governmental determinations of a general nature that affect all equally do not give rise to a due process right to be heard."); *Halverson v. Skagit Cty.*, 42 F.3d 1257, 1261 (9th Cir. 1994) ("[G]overnmental decisions which affect large areas and are not directed at one or a few individuals do not give rise to the constitutional procedural due process requirements of individual notice and hearing; general notice as provided by law is sufficient."); *Indiana Land Co., LLC v. City of Greenwood*, 378 F.3d 705, 710 (7th Cir. 2004) (holding that no notice and opportunity for hearing is necessary when legislative action is at issue because "its generality provides a safeguard that is a substitute for procedural protections"); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982) (legislative action "provides all the process that is due").

Accordingly, orders like the Joint Proclamation "directing non-essential businesses to cease operating" do not violate due-process rights because they are "generally applicable" and "affect[] thousands of businesses" rather than "targeting an individual or a single business." *Hartman*, 2020 WL 1932896, at *8; see also *Benner*, 2020 WL 2564920, at *4 (M.D. Pa. May 21, 2020) (rejecting procedural due process claim arising from order in the COVID-19 context).

Plaintiffs' facial due process challenge therefore fails as a matter of law.

## II. Plaintiffs Fail to State a Claim for Violation of the Fourth Amendment or That the Joint Proclamation Was Unconstitutional As Applied.

"A county or municipality may not be found liable under § 1983 via *respondeat superior* alone; it may only be found liable 'when execution of a government's policy or custom, whether made by its lawmakers or by those edicts or acts may fairly be said to represent official policy, inflicts the injury.'" *Menius v. Gaston Cty. Dep't of Soc. Servs.*, No. 3:20-CV-00043-MR, 2020 WL 7490407, at *4 (W.D.N.C. Dec. 21, 2020) (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)). "Further, the plaintiff must 'demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.'" *Ferrell v. City of Charlotte*, No. 3:14-CV-47, 2015 WL 13604391, at *6–7 (W.D.N.C. Mar. 31, 2015) (emphasis original) (quoting *Bd. Of Comm'rs of Bryan City v. Brown*, 520 U.S. 397, 404 (1997)). Critically, the action must "represent official policy." *Monell*, 436 U.S. at 694; *Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury."). Under this standard, plaintiffs' Amended Complaint fails to state a claim against the County arising out of the application of the Joint Proclamation's limitations to them.

### A. Plaintiffs' As-Applied Challenge and Fourth Amendment Claims Against the County Fail Because the County Cannot be Liable for CMPD's Alleged Conduct.

Plaintiffs' assert claims that (1) challenge the constitutionality of the Joint Proclamation as applied to them and (2) allege violations of the Fourth Amendment based on the actions of CMPD officers in arresting them for violating the Joint Proclamation's Gathering Limitation. (*See e.g.* Am. Compl., ¶ 13 (The defendants, "in enforcing regulations limiting the operation of certain businesses and activities, *by and through CMPD*, violated David Benham's Fourth Amendment right[s].."); ¶ 229 ("CMPD, backed by Defendants, had the power to investigate, interpret, and apply the

Proclamation"); ¶ 286 ("Defendants . . . authoriz[ed] CMPD officers to arrest [Benham] without warrants and without probable cause, and to unlawfully imprison him thereafter.")) (emphasis added). Plaintiffs also assert vague allegations referring collectively to actions that "Defendants" took to direct CMPD's actions. (Am. Compl., ¶¶ 122-123, 128-129).

These allegations fail to state a claim against the County, which has no control over CMPD and cannot "direct" CMPD.[6] As this Court explained,

> [T]he Court finds that Plaintiff has not identified any such policy or custom because the County has shown that it does not operate the CMPD, nor does it exercise any sort of management or control over it. Further, the officers of the CMPD are employees of Defendant City, not Defendant County, and the authority to administer and set policies for the CMPD rests solely with the City of Charlotte. In fact, it appears that the County's only involvement with the CMPD is to provide partial funding through a formula established in the 1996 Agreement. This funding arrangement alone cannot provide a basis for liability by the County.

*Ferrell*, 2015 WL 13604391, at *6 (internal citations omitted); *see also Newton v. City of Charlotte*, No. 3:14-CV-00672-FDW, 2015 WL 346949, at *4 (W.D.N.C. Jan. 26, 2015) (dismissing claims against the County based on vicarious liability and *respondeat superior* for actions of CMPD because "it is clear that the control and supervision of the CMPD officers rested with the City of Charlotte, and not with Defendant County" given that "the Agreements expressly provide that all [CMPD] functions—except for building security, intake center/arrest processing, radio services (non-police) and dispatch and telecommunications—are consolidated under the City of Charlotte.").

Plaintiffs' claims arising out of CMPD's enforcement of the Joint Proclamation against them therefore fail to state a claim against the County, which does not operate, manage or control CMPD.

**B. Plaintiffs Have Not Alleged Facts Sufficient to Support a Claim that the Joint Proclamation was Applied Against Them in an Unconstitutional Manner.**

Even if Plaintiffs' allegations pertained to actions over which the County exercised management or control, they would fail to state a claim and should be dismissed.

---

[6] Plaintiffs also refer to tweets by the City of Charlotte's Mayor Pro Tem, who has no policymaking authority for the County, that do not reference or act for the County. (Am. Compl. ¶¶ 124-26).

### 1. Plaintiffs Allege a Failure to Follow the Joint Proclamation

As noted above, to establish liability against a governmental entity Plaintiffs must allege and prove that they suffered injury from the execution of a custom or policy. Here, however, Plaintiffs instead allege that CMPD failed to abide by the "policy" at issue—the Joint Proclamation. More specifically, Plaintiffs allege that "[b]y its very terms . . . the Proclamation expressly exempted the activities of [Plaintiffs]." (Am. Compl. para. 8). According to the Amended Complaint, "[a]t all times the [Plaintiffs] were in full compliance with the Proclamation" (*id.* ¶ 113), and [t]his enforcement violated . . . the terms of the Proclamation itself." (*Id.* ¶ 129). Plaintiffs therefore claim that the Joint Proclamation simply did not apply to them and that any enforcement of the Joint Proclamation against them was erroneous. (*See e.g. Id.* ¶¶ 138, 144, 162, 224, 275-277, 280, 292-293). Alleging a failure to follow a custom or policy—as opposed to execution of a custom or policy that has the effect of violating protected rights—is, by definition, insufficient to state a claim against a local government.[7]

### 2. Enforcing The Joint Proclamation Did Not Deprive Plaintiffs Of Equal Protection Under The Law.

Plaintiffs allege that the enforcement of the Joint Proclamation against them violated their rights to equal protection under the law because it treated them differently from similarly situated

---

[7] Plaintiffs also allege that "Defendants" had an "unconstitutional policy, custom, and practice to exclude, target, and silence Benham based on the religious content and motivation of his speech and conduct." (*See* Am. Compl., ¶¶ 278-79, 287-92, 294-95). Because the enforcement actions against plaintiffs were carried out by CMPD, over which the County exercises no control, this allegation fails to state a claim against the County. In any case, this conclusory allegation is insufficient to state a claim against any defendant under § 1983. *See, e.g., Iqbal*, 556 U.S. at 680-81 (rejecting allegation that plaintiff was subjected to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest" as "conclusory and not entitled to be assumed true."); *Barrett v. Bd. of Educ. of Johnston Cty.*, N.C., 590 F. App'x 208, 210 (4th Cir. 2014) ("There were no factual allegations showing that the Board had a policy, custom, or practice that led to the alleged violations. The Appellants merely expressed a belief or an opinion without any supporting factual allegations."); *Smith v. Pollino*, No. 3:19-CV-00639-KDB-DCK, 2020 WL 2104947, at *5 (W.D.N.C. May 1, 2020) ("[W]hile Plaintiff alleges that the Village enacted an 'official policy' under which his right to free speech was violated, the Amended Complaint does not plead *facts* that establish such a policy") (emphasis original); *Cox v. Lamm*, No. 4:20-CV-52-FL, 2020 WL 5097832, at *4 (E.D.N.C. Aug. 28, 2020) (rejecting "bare allegation of a 'policy of excessive force'" as "insufficient to plausibly state a claim for liability against a municipality" when all plaintiff "point[ed] to in support of his claim of a policy or custom [we]re the alleged constitutional violations by another defendant").

21

persons and groups. However, Plaintiffs' allegations, if true, would not establish disparate treatment that violates the right to equal protection. As this Court previously explained in another matter that Plaintiff Benham filed:

> The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents. Thus Plaintiffs can establish an equal protection claim by showing that they were intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.

*Benham v. City of Charlotte*, No. 3:10CV299, 2013 WL 1319805, at *6 (W.D.N.C. Mar. 28, 2013) (granting summary judgment for defendants who denied application for public assembly permit because permitted events and the plaintiffs' events were not "in all relevant aspects alike"). The government "does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. . . . [E]qual protection analysis is not a license for the courts to judge the wisdom, fairness, or logic of the legislative choices." *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008).

Under this standard, Plaintiffs' allegations fail to state a claim. While Plaintiffs repeatedly state the conclusion that the Joint Proclamation was applied differently to them because of their religious beliefs and the content of their message, Plaintiffs do not (and cannot) direct the Court to a single instance where a group engaged in a secular protest or sidewalk counseling was exempted from the Joint Proclamation's prohibition on gatherings in excess of ten people. Instead, Plaintiffs attempt to compare their activities to dissimilar activities specifically permitted under the Joint Proclamation, such as the operation of grocery stores, outdoor activity at a public park, and shopping at Home Depot. Allowing those activities to proceed while enforcing the limitation on other gatherings in excess of ten people does not state a claim for depriving Plaintiffs of equal protection under the law; rather, it simply reflects the enforcement of the "legislative choices" embodied in the Joint Proclamation.

22

Thus, the Court should dismiss Plaintiffs' Equal Protection claim because they improperly request that the Court second guess the wisdom of the choices made by the government to save lives in the midst of a pandemic, and have identified no similarly situated persons or groups treated differently than they were. *See Talleywhacker, Inc. v. Cooper*, No. 5:20-CV-218-FL, 2020 WL 3051207, at *10 (E.D.N.C. June 8, 2020) (rejecting Equal Protection claim brought by business challenging classifications under the Governor's Executive Order).

### C. Plaintiffs Have Not Alleged Facts Sufficient to Establish That They Were Exempt from The Revised Joint Proclamation.

Plaintiffs finally assert that they fell within certain exemptions to the Joint Proclamation's restrictions for "Essential Businesses" and "Essential Activities" and that they were not allowed to operate under these exceptions only because of their viewpoint and mission. Plaintiffs' position, however, requires such a broad reading of the exemptions that the exceptions would swallow the rule.

While Plaintiffs contend that their sidewalk protests should have been exempt from the Joint Proclamation because their activities constituted "healthcare services," they allege no facts that would support a finding that they qualified as a health care provider under the Joint Proclamation. For example, Plaintiffs allege that they provided free sonograms. Merely providing sonograms does not, in itself, establish that Plaintiffs provided "healthcare services." Even if the on-site ultrasound constituted "healthcare," it did not convert Plaintiffs' sidewalk protests and prayer activities into exempt healthcare services.[8]

Plaintiffs also allege that they were exempt from the Joint Proclamation's restrictions because they provided "social services." However, "social services" is not a generic term that can be applied indiscriminately to any well-intentioned effort to guide or assist other people. Social services in North

---

[8] Plaintiffs' allegations that they provided women information about drugs that could undo the effects of "chemical abortions" fail for the same reason. Plaintiffs do not allege that they were providing these drugs on the sidewalk as part of their prayers and protests, and thus their gathering for such activities cannot be considered "healthcare."

23

Carolina are provided subject to extensive statutory and regulatory guidance. "North Carolina has a federally mandated, state supervised, county administered social services system." (https://tinyurl.com/y8zz4lde). Chapter 108A of the North Carolina General Statutes and Title 10a, Chapter 67, of the North Carolina Administrative Code are devoted entirely to social services. Chapter 90B of the North Carolina General Statutes sets out the Social Worker Certification and Licensure Act, which establishes the North Carolina Social Work Certification and Licensure Board. N.C. Gen. Stat. § 90B-4(b) requires licensure in order to practice "Clinical Social Work." Defined under N.C. Gen. Stat. § 90B-3(6). Title 21 of Chapter 63 of the North Carolina Administrative Code is also devoted to "Social Work Certification," and regulates qualifying examinations, licensing fees, ethical standards, and disciplinary procedures for social workers. Plaintiffs have not alleged facts sufficient to establish that they fall within the scope of "social services" as defined under North Carolina law such that they were exempt from the application of the Joint Proclamation.

In any case, the alleged "social services" that Plaintiffs describe in their Complaint are distinct from the sidewalk protests at issue in this lawsuit. For example, Cities4Life alleges that it provides "various social services to women," including: the delivery of items such as diapers and baby furniture; groceries; money for expenses such as rent, utilities, and wedding services; and maternity clothes. (Am. Compl. ¶ 50). There are no allegations suggesting that Plaintiffs provided these services during their sidewalk protests. The mere fact that Plaintiffs may have provided social services in other places and at other times would not exempt otherwise non-exempt activities from the Joint Proclamation, nor would applying the Joint Proclamation to Plaintiffs' on-site protests prevent Plaintiffs from providing those services at other times and in other places. Indeed, the delivery of essential items would have been expressly permitted.

In short, Plaintiffs have not stated a claim that they were exempt from the application of the Joint Proclamation such that they could have been treated differently from other "exempt" persons and entities.

## **CONCLUSION**

For the reasons stated above, Plaintiffs' Amended Complaint should be dismissed with prejudice.

Respectfully submitted this 4th day of October, 2021.

WOMBLE BOND DICKINSON (US) LLP

*/s/ W. Clark Goodman*
Michael Barnhill (N.C. Bar No. 9690)
W. Clark Goodman (N.C. State Bar No. 19927)
Matthew F. Tilley (N.C. State Bar No. 40125)
Patrick G. Spaugh (N.C. State Bar No. 49532)

301 South College Street, Suite 3500
Charlotte, NC 28202-6037
Telephone: (704) 331-4981
Email: Mike.Barnhill@wbd-us.com
Email: Clark.Goodman@wbd-us.com
Email: Matthew.Tilley@wbd-us.com
Email: Patrick.Spaugh@wbd-us.com

*Attorneys for Defendant Mecklenburg County, North Carolina*