## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CIVIL ACTION NO. 3:20-CV-00232-GCM

| | |
|---|---|
| **GLOBAL IMPACT MINISTRIES,** **DAVID BENHAM,** **CITIES4LIFE, INC.,** | |
| **Plaintiffs,** | |
| **v.** | **ORDER** |
| **MECKLENBURG COUNTY,** **CITY OF CHARLOTTE,** | |
| **Defendants.** | |

**THIS MATTER** comes before the Court on the Motions to Dismiss by Defendant Mecklenburg County (ECF No. 39) and Defendant City of Charlotte (ECF No. 41). Plaintiffs filed responses to the motions to dismiss (ECF No. 44 & 45), and Defendants replied (ECF No. 47 & 48). The Court also ordered supplemental briefing on the topic of mootness, which the parties provided. *See* ECF No. 49–56. The matter is now ripe for disposition. For reasons discussed in more detail below, the Court will grant Mecklenburg County's motion in part and deny it in part, and will deny the City of Charlotte's motion.

### I.    BACKGROUND

This is a civil rights suit arising under 42 U.S.C. § 1983.[1] Plaintiff David Benham is a pro-life advocate in Charlotte, North Carolina who serves as president and chairman of Plaintiff Cities4Life, a Christian 501(c)(3) "pro-life ministry" nonprofit organization. Plaintiff Global Impact Ministries (operating as Love Life) is another Christian pro-life nonprofit organization. In

---

[1] The facts described in this section are drawn from the Amended Complaint and are treated as true, as the Court explains in the Standard of Review section, *infra*.

April 2020, at the dawn of the COVID-19 pandemic, Charlotte police officers arrested Benham and members of Cities4Life and Love Life outside an area abortion clinic for violating a joint stay-at-home order issued by Defendant City of Charlotte and Defendant Mecklenburg County. Plaintiffs now seek declaratory relief and damages against the city and county, arguing that the municipalities violated their rights under the First, Fourth, and Fourteenth Amendments.

### A. Plaintiffs' Pro-Life Advocacy

David Benham has been a pro-life activist for more than 20 years. ECF No. 36 ¶ 34. Benham views his advocacy as a "Christian duty, an extension of God's command to love one's neighbor." *Id*. ¶ 35. In 2013, Benham co-founded Cities4Life, a nonprofit organization that primarily operates in Charlotte, North Carolina. *See id.* ¶¶ 36, 38–39. Cities4Life "seeks to ensure that women going into abortion clinics are aware of the alternatives to abortion and the social services and other support available to them." *Id*. ¶ 42. Some of the organization's activities occur in close proximity to abortion clinics. For example, Cities4Life partners with another organization, H.E.L.P. Crisis Pregnancy Center, to provide free sonograms right outside clinics. *See id.* ¶ 45. Cities4Life members "pray for any needs that people going in or out of the facilities may share with them," and "informs women about . . . medical  treatments that attempt to reverse" chemical abortions. *See id*. ¶¶ 41, 46–48. Cities4Life also offers financial and material support to women who decide not to terminate their pregnancies, and "partners with local churches . . . to meet the physical and spiritual needs of women considering abortion." *See id*. ¶¶ 50–51.

Love Life, the other plaintiff in this case, was founded in 2016. *Id.* ¶ 69. Like Cities4Life, some of the organization's activities occur directly outside abortion clinics, and others do not. The organization "hires personnel to work outside abortion facilities alongside Christian sidewalk ministers." *Id*. ¶ 65. Love Life organized "prayer walks," in which churchgoers would walk in

2

silent prayer around the half-mile-long circular road surrounding the local abortion clinic. *See id*. ¶¶ 71–72. Like Cities4Life, Love Life provided a variety of services to individuals related to its pro-life mission, including "spiritual counseling, prayer, emotional counseling, referrals for medical treatment to attempt to reverse the effect of abortion-inducing drugs, post-abortion counseling, adoption referrals, foster-care training . . . and material resources to women facing unplanned pregnancies." *Id*. ¶ 54.

### B. The Proclamation

On March 24, 2020, the Chairman of the Mecklenburg County Board of Commissioners and the Mayor of the City of Charlotte jointly issued a "Revised Joint Proclamation" in response to the COVID-19 pandemic.[2] The Proclamation was, in essence, a stay-at-home order. It stated: "All individuals currently living within Mecklenburg County including the City of Charlotte and the named Towns are restricted to shelter at their places of residence." ECF No. 36-1 at 4. The Proclamation prohibited "all public and private gatherings of more than 10 people, except for the limited purposes permitted by this Proclamation." *Id*. Violations of these rules were punishable as a class 2 misdemeanor under N.C. Gen. Stat. § 14-288.20A. *Id*. at 14.

The Proclamation provided for various exceptions to the stay-at-home order. It authorized individuals to leave their homes for certain "Essential Activities," including "for necessary supplies and services," "for outdoor activity," and to work in "Essential Businesses or Operations." ECF No. 36-1 at 4. Essential businesses included "Healthcare and Public Health Operations," "Human Services Operations," and "organizations that provide charitable and social services." *Id*.

---

[2] The World Health Organization designated COVID-19 a pandemic on March 11, 2020. *See* Jamie Gumbrecht & Jacqueline Howard, *WHO Declares Novel Coronavirus Outbreak a Pandemic*, CNN, https://www.cnn.com/2020/03/11/health/coronavirus-pandemic-world-health-organization/index.html (March 11, 2020).

3

at 9. The restriction on gathering sizes also did not apply to essential businesses, which were "encouraged to remain open" but ordered to observe social distancing requirements "to the greatest extent feasible." *Id*. at 4.

### C. The Arrest

An attorney for Cities4Life and Love Life spoke with a representative of the Charlotte-Mecklenburg Police Department (CMPD) on March 28, 2020. ECF No. 36 ¶ 118. The representative, Major Kornberg, "confirmed . . . that the activities of Cities4Life and Love Life complied with the Proclamation and the Governor's Executive Order issued on March 27, 2020." *Id.*

That same day, a user on Twitter posted pictures of the groups at the abortion clinic. *See* Heather Mobley (@heatheremobley), Twitter (Mar. 28, 2020, 8:46 AM), https://twitter.com/heatheremobley/status/1243882027323187201. The accompanying tweet read: "Protesters currently gathering at the abortion clinic where I volunteer . . . with CMPD doing nothing to disperse them." *Id.* The post "tagged" the Twitter accounts for the City of Charlotte, the Mayor, and three City Councilmembers: Julie Eiselt, Dimple Ajmera, and Larken Egleston.[3] *Id.* Ajmera replied: "I got an email about this a couple of days ago and I had asked @CMPD for an update. Waiting on their response." So did Egleston: "Violations of the order can be reported quickly and easily through the CLT+ app." *Id.*

---

[3] The Amended Complaint does not identify the original tweet, the accounts tagged by the original author, or the responses by Ajmera and Egleson. The Court takes judicial notice of those features of the tweet, which are readily viewable from the retweeted tweet cited in the Amended Complaint. *See* Fed. R. Evid. 201. The authenticity or accuracy of those tweets has not been challenged by Defendants. *See Gilmore v. Jones*, 370 F. Supp. 3d 630, 668 n.41 (W.D. Va. 2019) (taking judicial notice of the contents of a website cited by party).

Eiselt, an at-large member who served as Mayor Pro Tempore, "re-tweeted" the original post. *See* Julie Eiselt (@JulieEiselt), Twitter (Mar. 28, 2020, 9:27 AM), https://twitter.com/JulieEiselt/status/1243892522469986304. She wrote: ".@CMPD please shut this activity down. Congregating/leaning into people's car windows is dangerous and is a clear violation of stay-at-home regulations." *Id.* Another Twitter user—a "professional storyteller" at WCNC Charlotte—responded to Eiselt: "CMPD officer on scene says they are not violating the letter of the stay-at-home order." *Id.*; ECF No. 36 ¶ 127.

According to the Plaintiffs, "this pressure from Defendants led to the CMPD taking drastic enforcement action on April 4, 2020." ECF No. 36 ¶ 129. On that day, at 11:30 am, approximately ten CMPD patrol cars were present at the abortion clinic. *Id.* ¶ 131. Only about nine members of the plaintiff organizations were there, including three sidewalk ministers standing in front of the facility.[4] *See id.* ¶¶ 131–32. The pro-life advocates were all observing social distancing requirements.[5] *Id.* ¶ 131. CMPD arrested Benham, telling him that the arrest was because he was leading a protest and was part of a gathering of more than ten people in violation of the Proclamation. *Id.* ¶¶ 138–39. Five other individuals from Cities4Life and Love Life were also cited or arrested.[6] *Id.* ¶ 157.

---

[4] By contrast, Plaintiffs allege that "scores (if not hundreds) of people" were inside a nearby Home Depot, which experienced no adverse action as a result of the Proclamation. ECF No. 36 ¶¶ 133–36.

[5] Specifically, Plaintiffs allege that they ensured social distancing compliance by marking six-foot intervals on the sidewalk in chalk and by providing and using hand sanitizer. ECF No. 36 ¶¶ 110 & 111.

[6] Plaintiffs allege a variety of damages related to CMPD's enforcement action on April 4. Benham claims that his reputation in the community and his business reputation suffered because of the arrest. *See, e.g.*, ECF No. 36 ¶ 149. He claims that he suffered economic damages because (1) he was prevented from working because of the arrest; (2) he incurred needless travel costs; and (3) several potential clients decided not to use his services as a real estate agent because of the arrest. *Id.* ¶ 151–54. Similarly, members of the two nonprofit groups allege that they were

**D. The Aftermath**

Following the arrests, CMPD allegedly continued to target the pro-life advocates. On April 11, Major Kornberg warned Plaintiffs that, beginning on April 18, CMPD would determine that a gathering of ten people existed even if there were fewer than 10 advocates present. *Id.* ¶¶ 165–66. For example, if there were five pro-life advocates and five onlookers arrived, then the gathering would exceed 10 people and the advocates would be punished. *See id.* As a result of CMPD's new interpretation, the activities of Plaintiffs were curtailed until the expiration of the Proclamation on April 29, 2020. *See id.* ¶¶ 167–71.

Plaintiffs filed suit against the city and county on April 18, 2020. *See* ECF No. 1. The Court dismissed some of Plaintiffs' claims related to prospective injunctive relief, finding that they had been mooted by the expiration of the Proclamation. *See* ECF No. 33 at 3. Citing *Younger* abstention, the Court also stayed the civil action pending resolution of the criminal cases against Benham and the other advocates. *Id.* at 8.

After the Court lifted the stay, Plaintiffs filed an Amended Complaint with the consent of the Defendants. ECF No. 35, 36. The Amended Complaint sought declaratory relief, nominal and compensatory damages, and attorneys' fees for redress of violations under the First, Fourth, and Fourteenth Amendments. The city and county each filed a Rule 12(b)(6) motion to dismiss.

**II.  DISCUSSION**

The Court now turns to the parties' arguments.

**a.  Standard of Review**

---

harmed by the arrests. The groups allege that they incurred attorneys' fees and seek nominal and compensatory damages. *See id.* ¶¶ 158–60.

Rule 12(b)(6) permits a party to move for dismissal based on the complaint's failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). On a Rule 12(b)(6) motion, the Court does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses. *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016). Instead, the Court considers whether the complaint contains "sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court ruling on a Rule 12(b)(6) motion to dismiss reviews the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded factual allegations. *Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994). But the court need not accept as true unwarranted inferences, unreasonable conclusions, or arguments. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

### b. Mootness

Before considering the parties' substantive arguments, the Court first takes up a jurisdictional issue: mootness. Because the Constitution empowers federal courts to hear only live "cases or controversies," a court lacks subject matter jurisdiction when no such case or controversy exists. *See* U.S. Const. art. III, § 2; *S.C. Coastal Conservation League v. United States Army Corps of Engineers*, 789 F.3d 475, 482 (4th Cir. 2015).

The Court previously dismissed Plaintiffs' claims for injunctive relief, finding that they had been mooted by the replacement of the challenged Proclamation. *See* ECF No. 33 at 3 ("Plaintiffs' requests for prospective relief are moot."). The parties were later ordered to brief (1) whether the expiration of the Proclamation at issue mooted Plaintiffs' claims for declaratory relief; and (2) whether the Plaintiffs' facial challenges to the Proclamation would also be mooted by the potential nonavailability of declaratory relief. *See* ECF No. 49 at 1.

### i. Declaratory Relief

7

Ordinarily, the repeal of a challenged ordinance or statute will moot a claim for declaratory relief. *See Diffenderfer v. Central Baptist Church, Inc.*, 404 U.S. 412, 414–15 (1972) (per curiam); *Chapin Furniture Outlet, Inc. v. Town of Chapin*, 252 F. App'x 566, 570 (4th Cir. 2007). In the declaratory relief context, "what makes a declaratory judgment action a proper judicial resolution of a case or controversy rather than an advisory opinion is the settling of some dispute which affects the behavior of the defendant toward the plaintiff." *Jordan v. Sosa*, 654 F.3d 1012, 1025 (4th Cir. 2011). Accordingly, the test for whether a sought-after declaration is moot is whether the declaration would affect the behavior of the defendant towards the plaintiff. *See Rhodes v. Stewart*, 488 U.S. 1, 4 (1988) (per curiam); 15 Moore's Federal Practice – Civil § 101.98B (2021) ("The question is whether the declaratory judgment will actually alter the conduct of the named parties.").

In this case, Plaintiffs seek a declaration that an expired Proclamation in effect between March 24, 2020 and April 29, 2020 was unconstitutional, either on its face or as applied to them. But such a pronouncement would be a prohibited advisory opinion because it would have no tendency to affect the actions of the defendants. Insofar as the declaration is concerned, there is simply no live controversy here.[7] *See Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41 (1937) (explaining that to be justiciable, a controversy "must be definite and concrete . . . . a real and substantial controversy admitting of specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts").

Plaintiffs resist this conclusion by characterizing their sought-after declaration as "retrospective" relief, which is "inextricably linked to its damages claim." ECF No. 54 at 1. Citing non-binding authority, they reason that because a finding of unconstitutionality is a necessary

---

[7] There is no indication—and Plaintiffs do not argue otherwise—that an exception to mootness applies, such as the voluntary cessation doctrine.

predicate for a damages claim, the request for declaratory relief is not moot. *See Marks v. City Council of the City of Chesapeake*, 723 F. Supp. 1155, 1159–60 (E.D. Va. 1988); *Grimm v. Gloucester County School Board*, No. 4:15-cv-54, 2017 WL 9882602, at *3 (E.D. Va. Dec. 12, 2017); *Crue v. Aiken*, 370 F.3d 668, 677 (7th Cir. 2004); *PETA v. Rasmussen*, 298 F.3d 1198, 1202 n.2 (10th Cir. 2002).

The Court is unpersuaded. On the surface, the argument has logical appeal: To obtain damages, Plaintiffs must prove that the Proclamation, or its application, was unconstitutional. But the approach urged by Plaintiffs muddles together two very different types of remedies—one equitable, one legal—solely because the method of analysis is the same. This cannot be correct. Just as a plaintiff must demonstrate Article III standing "for each form of relief that is sought," constitutional mootness principles ought to be applied separately and distinctly, not "dispensed in gross." *See Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (summarizing standing principles).

In short, Plaintiffs cannot bootstrap a moot claim for declaratory relief to a live claim for damages. Because the Proclamation at issue is no longer in effect, declaratory relief related to its constitutionality presents no live controversy, and Plaintiffs' claims for declaratory relief will be dismissed as moot.

### ii. Facial Challenges

The Court also asked the parties to brief whether the nonavailability of declaratory (or injunctive) relief would moot Plaintiffs' facial challenges to the Proclamation.

In *Rock for Life-UMBC v. Hrabowski*, the Fourth Circuit concluded that a revision to a challenged policy mooted an overbreadth challenge to the policy. *See* 411 F. App'x 541, 550–51

(4th Cir. 2010) (Conrad, J.).[8] The *Rock for Life-UMBC* Court explained that facial challenges based on overbreadth are "necessarily forward-thinking," rendering the facial challenge "moot notwithstanding the fact that it seeks the recovery of damages rather than injunctive relief." *Id.* Citing this case, Mecklenburg County urges the Court to find that all of Plaintiffs' facial challenges are "necessarily prospective," and therefore moot. ECF No. 53 at 2. In response, Plaintiffs acknowledge that *Rock for Life-UMBC* forecloses their facial overbreadth challenge, but argues that the availability of nominal damages as a remedy for their facial challenges prevents their other facial attacks on the Proclamation from being mooted. ECF No. 52 at 3.

The Court agrees with Plaintiffs. Viewing the complaint in the light most favorable to the Plaintiffs, the Amended Complaint alleges that the Proclamation was either unconstitutional on its face, or constitutional on its face and unconstitutional as applied. In the event that the Court determines at the merits stage that the Proclamation was facially unconstitutional, nominal damages could potentially be available to redress the constitutional violation. *See Familias Unidas v. Briscoe*, 619 F.2d 391, 402 (5th Cir. 1980) (awarding nominal damages based on a finding of facial unconstitutionality); *Virdi v. DeKalb County Sch. Dist.*, 216 F. App'x 867, 873 (11th Cir. 2007) ("By showing that [a challenged program] was facially unconstitutional, Virdi became entitled to nominal damages.").

Based on the foregoing, the Court will dismiss Plaintiffs' facial overbreadth challenge as moot. The remaining facial challenges to the Proclamation are not moot. The Court now turns to the merits of Defendants' Rule 12(b)(6) motions.

### c.  First Amendment Claims

---

[8] Sitting by designation.

Plaintiffs allege three types of First Amendment violations: violations of the right of religious exercise and belief, violations of the right to free speech, and violations of the right of expressive association.[9] For each type of claim, Plaintiffs raise both facial and as-applied challenges.[10]

### i.  Right of Religious Exercise

Plaintiffs claim that the Proclamation infringed their rights under the Free Exercise Clause. Under that provision of the First Amendment, applicable to the states via the Fourteenth Amendment, "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I; *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021).

The parties debate what constitutional standard of review ought to apply in this case. Ordinarily, a neutral, generally applicable law that incidentally burdens religion is reviewed using the deferential rational basis test. *Jesus Christ is the Answer Ministries, Inc. v. Baltimore City*, 915 F.3d 256, 265 (4th Cir. 2019). Under the rational basis test, a law is upheld as long as it is rationally related to a legitimate government interest. *Bethel World Outreach Ministries v. Montgomery County Council*, 706 F.3d 548, 561 (4th Cir. 2013). However, when a law is not neutral, or is not generally applicable, it triggers "the most rigorous of scrutiny"—strict scrutiny. *See Employment Division v. Smith*, 494 U.S. 872, 878–82 (1990); *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546 (1993). To satisfy strict scrutiny, the government must show that the law

---

[9] The Amended Complaint also brought a facial overbreadth claim under the First Amendment. *See* ECF No. 36 ¶ 203. As discussed earlier, that claim is moot.

[10] Charlotte's motion to dismiss argues that the Amended Complaint fails to adequately plead facial challenges, urging the Court to find that it is "substantively an as-applied challenge." ECF No. 42 at 7. The Court agrees with Plaintiffs that the Amended Complaint clearly pleads facial challenges in the alternative. At the motion to dismiss stage, the Court does not consider the relative merits of a facial theory or an as-applied theory, considering only whether the Amended Complaint states a plausible claim upon which relief can be granted. *See King*, 825 F.3d at 214.

11

"advance[s] interests of the highest order" and is "narrowly tailored in pursuit of those interests." *Church of Lukumi Babalu Aye*, 508 U.S. at 546 (cleaned up).

Until fairly recently, the Supreme Court's Free Exercise jurisprudence was highly deferential to COVID-19 regulations that burdened religion. *See, e.g.*, *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1614 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief) (explaining that the judiciary should not second-guess public health decisions, especially while local officials are "actively shaping their response to changing facts on the ground"). That deference changed dramatically with the Supreme Court's decisions in *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63 (2020) (per curiam) and *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) (per curiam). In *Tandon*—which synthesized *Roman Catholic Diocese*—the Court adopted a far more exacting methodology in assessing the neutrality and general applicability of COVID-19 regulations. *See* Wendy K. Mariner, *Shifting Standards of Judicial Review During the Coronavirus Pandemic in the United States*, 22 German L.J. 1039, 1056 (2021) (arguing that the Supreme Court's changing interpretation of neutrality has subtly redefined protections for religious rights). The *Tandon* Court outlined three new guideposts for Free Exercise claims: "First, government regulations are not neutral and generally applicable . . . whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296 (citing *Roman Catholic Diocese*, 131 S. Ct. at 67).

Next, "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue. Comparability is concerned with the risks various activities pose, not the reasons why people gather." *Id*. (citations omitted).

12

Finally, the government bears the burden of showing that the challenged law satisfies strict scrutiny. *Id.* To prove that a law is "narrowly tailored," the government must show that "measures less restrictive of the First Amendment activity could not address its interest in reducing the spread of COVID." *Id.* at 1296–97. "Where the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even where the same precautions are applied." *Id.* at 1297.

Mecklenburg County urges the Court not to "analyze the Joint Proclamation against the standards applied at the end of 2020," and instead asks the Court to apply the Supreme Court's earlier, more permissive earlier cases on COVID-19 restrictions. ECF No. 47 at 3–4. But there is simply no authority that permits the Court to adopt shifting legal standards based on when the challenged conduct occurred. *Tandon*, then, sets forth the applicable legal principles.

The Court now turns to the Proclamation at issue. Plaintiffs allege that the Proclamation precluded them from engaging in pro-life activities, which Plaintiffs believe are a form of religious ministry. *See, e.g.*, ECF No. 36 ¶¶ 75–82. They allege that shoppers at Home Depot were exempted from gathering limits, while their religiously motivated gatherings were prohibited. *See id.* ¶ 133–36. Those activities are comparable for purposes of the Free Exercise analysis, because comparability "is concerned with the risks various activities pose." *Tandon*, 141 S. Ct. at 1296. Because shopping indoors is likely to present greater risk for spreading COVID-19 than socially distanced sidewalk advocacy, strict scrutiny must apply here. *See id.* (explaining that "government regulations are not neutral and generally applicable . . . whenever they treat *any* comparable secular activity more favorably than religious exercise.").

Because strict scrutiny applies, Defendants bear the burden of showing that the Proclamation was narrowly tailored to achieve a compelling government interest. Although

slowing the spread of COVID is "unquestionably a compelling interest," *Roman Catholic Diocese*, 141 S. Ct. at 67, Defendants have not met their burden of showing narrow tailoring. The Court will therefore not dismiss Plaintiffs' plausible Free Exercise claim.

### ii. Right of Free Speech

The First Amendment, applicable to state and local governments via the Fourteenth Amendment, proscribes governments from "abridging the freedom of speech." *See* U.S. Const. amend. I; *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019). "[T]he First Amendment protects speech along a spectrum, so that laws that impinge upon speech receive different levels of judicial scrutiny depending on the type of regulation and the justifications and purposes underlying it." *Id.* (cleaned up). When a regulation is content-discriminatory, it is presumptively invalid and normally is subject to strict scrutiny. *Id.* To determine whether a law is content-discriminatory, courts look to whether the government "has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). "A regulation that serves purposes unrelated to the content is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.*

Content-neutral regulations in public fora[11] are assessed using the time, place, and manner doctrine. *Ross v. Early*, 746 F.3d 546, 552 (4th Cir. 2014). Under that doctrine, reasonable restrictions on the time, place, and manner of speech are permissible, provided that restrictions are "narrowly tailored to serve a significant government interest and leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791. Narrow tailoring is

---

[11] Neither party appears to dispute that the relevant forum—the sidewalk outside the abortion clinic—is a public forum. *See Frisby v. Schultz*, 487 U.S. 474, 480 (1988).

satisfied as long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation. *Id*. at 799.

The parties disagree about what standard to apply.[12] Defendant Mecklenburg County argues that the Proclamation was a valid content-neutral time, place, and manner restriction. Plaintiffs, pointing to the Supreme Court's recent Free Exercise cases, argue that the law was content-discriminatory and therefore subject to strict scrutiny.

The Court agrees with Mecklenburg County. Viewing the well-pleaded facts in the light most favorable to Plaintiffs, there is no indication that the primary purpose of issuing the Proclamation was related to disagreement with the Plaintiffs' message. Rather, the Proclamation appears to have burdened Plaintiffs' speech incident to its response to a general state of emergency. *See* ECF No. 36-1 at 4 ("This Joint Proclamation is to ensure the maximum number of people self-isolate in their places of residence to the maximum extent feasible . . . .").

There is admittedly an obvious logical incongruity in finding that the Proclamation was not content-neutral for purposes of the free exercise claim, but content-neutral for purposes of the free speech claim. But neither the Supreme Court nor the Fourth Circuit has applied *Tandon*'s modified approach to content neutrality outside of the context of free exercise claims. There is simply no indication that *Roman Catholic Diocese* and *Tandon*, both per curiam decisions made in emergency injunction rulings, were intended to supplant decades of the Supreme Court's established free speech jurisprudence. *But see* Nelson Tebbe, *The Principle and Politics of Equal*

---

[12] The Court is unpersuaded by Mecklenburg County's argument that the Proclamation solely limited conduct, not speech, and therefore did not implicate the Free Speech Clause. *See* ECF No. 40 at 11–12 (citing *Lighthouse Fellowship Church v. Northam*, 358 F. Supp. 3d 418 (E.D. Va. 2020).

*Value*, 121 Colum. L. Rev. 2397, 2425 (2021) (arguing that the Supreme Court may extend its approach to free speech cases in the future).

Because the Proclamation was content neutral, the question becomes whether it ran afoul of the time, place, and manner doctrine. The Court concludes that it did not. The Proclamation unquestionably served an "significant interest": preventing the spread of a pandemic virus. *See Roman Catholic Diocese*, 141 S. Ct. at 67 ("Stemming the spread of COVID-19 is unquestionably a compelling interest . . . ."). The restrictions in question were also narrowly tailored because they promoted the Defendants' interest in slowing the rate of contagion. Absent the regulations, that interest would have been achieved less effectively. As another district court observed: "Because of the ease with which COVID-19 spreads . . . a gathering larger than ten people poses an increased risk that more people will get the virus if one of the attendees has it." *Antietam Battlefield HOA v. Hogan*, 461 F. Supp. 3d 214, 235 (D. Md. 2020).

Finally, the Court notes that there were "ample alternative channels" for Plaintiffs' incidentally-restricted speech. For example, nothing in the Proclamation precluded Plaintiffs from engaging in pro-life advocacy on the sidewalk in smaller groups, from engaging in advocacy activities at multiple different clinics, or from shifting some of their activities online. *See id*. at 236.

Because the Proclamation was a valid time, place, and manner restriction, the Court concludes that Plaintiffs have not stated a claim under the Free Speech Clause. That claim will be dismissed.

### iii. Right of Expressive Association

Mecklenburg County next moves to dismiss Plaintiffs' claims based on the right of expressive association. Under the First Amendment, individuals have the right to associate for the

purpose of engaging in protected First Amendment activity. *See Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 146 (4th Cir. 2009) (citing *Roberts v. U.S. Jaycees,* 468 U.S. 609, 618 (1984)). A regulation will not infringe the right of expressive association if it serves compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.[13] *Roberts*, 468 U.S. at 623.

For essentially the same reasons that Plaintiffs do not state a claim for free speech, they do not state a claim for expressive association. Plaintiffs were free to associate in groups of fewer than 10 people; and (2) alternative means of gathering, like the Internet, permitted similar First Amendment activity. *See Six v. Newsom*, 462 F. Supp. 3d 1060, 1071–72 (C.D. Cal. 2020) (identifying alternatives like Zoom and Microsoft Teams in an intimate association case); *SH3 Health Consulting, LLC v. Page*, 459 F. Supp. 3d 1212, 1225 (E.D. Mo. 2020) ("Through social media, email, blogs, and telephones, Plaintiffs can discuss whatever they would like with whomever they like, without restraint from the Orders.").

### d. Fourth Amendment Claim / As-Applied Claims

Benham alleges two separate Fourth Amendment violations: first, that he was unlawfully detained without reasonable suspicion, and second, that he was unlawfully arrested without probable cause. Mecklenburg County moves to dismiss Benham's Fourth Amendment claims against them and all of the Plaintiffs' as-applied claims, challenging the basis for municipal liability under 42 U.S.C. § 1983.[14]

---

[13] As the Supreme Court has recognized, this standard is effectively the same inquiry as the time, place, and manner test. *See American Legion Post 7 v. City of Durham*, 239 F.3d 601, 609 n.9 (4th Cir. 2001) (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 298 (1984)).

[14] Similarly, the City of Charlotte contests § 1983 municipal liability for *all* of Plaintiffs' claims, arguing that there was no relevant city "policy or custom" to give rise to liability under *Monell*. The Court is befuddled by this claim because Plaintiffs plainly allege that the issuance and

Although municipalities can be liable for violating civil rights under 42 U.S.C. § 1983, they cannot be liable via *respondeat superior*. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, municipalities are only liable when their own conduct—not that of an employee or agent—inflicted the injury at issue. *See id.* A municipality inflicts an injury when the municipality's deliberate conduct "was the moving force behind the injury alleged." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 303 (1997). The plaintiff must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*

Mecklenburg County challenges causation in connection with Benham's Fourth Amendment claims. The county observes that it exercises no control over the Charlotte-Mecklenburg Police Department, and that its sole involvement with the department is to contribute some funding through a formula established by agreement with the City of Charlotte. *See Ferrell v. City of Charlotte*, Civil Action No. 3:14-cv-47, 2015 WL 13604391, at *6 (W.D.N.C. Mar. 31, 2015); *Newton v. City of Charlotte*, No. 3:15-CV-00672-FDW, 2015 WL 346949, at *4 (W.D.N.C. Jan. 26, 2015). The county argues that because it had no ability to illegally detain or arrest Benham, it could not have been the "moving force behind the injury alleged." Plaintiffs do not rebut the assertion. Because Mecklenburg County's conduct could not be the "moving force" behind Benham's detention or arrest, Benham's Fourth Amendment claims against the County must be dismissed.

Similarly, Mecklenburg County cannot be liable as a matter of law for the as-applied claims pled by Plaintiffs. If indeed the Proclamation was constitutional on its face but unconstitutionally applied by CMPD, then Mecklenburg County could not have proximately caused the constitutional

enforcement of the Proclamation caused them injury. *See Berkley v. Common Council*, 63 F.3d 295, 299 (4th Cir. 1995) (describing legislation as "the prototypical government conduct that can give rise" to municipal liability).

violations at issue. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (explaining that § 1983 causation "encompasses . . . proximate cause"). The actions of CMPD in that scenario would operate as a superseding cause that severed the county's liability. *See Kane v. Lewis*, 604 F. App'x 229, 234–35 (4th Cir. 2015) (describing proximate cause principles). Plaintiffs' as-applied claims against Mecklenburg County will be dismissed.

### e. Fourteenth Amendment Due Process Claims

Mecklenburg County next moves to dismiss Plaintiffs' Fourteenth Amendment Due Process claims for vagueness and inadequate procedural due process.

### i. Vagueness

The void-for-vagueness doctrine requires that statutes "give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement." *Manning v. Caldwell*, 930 F.3d 264, 272 (4th Cir. 2019) (en banc). It is closely related to the First Amendment overbreadth doctrine. *See* 1 Rodney A. Smolla, Freedom of Speech § 6.2 (3d ed. 2021)

After carefully considering relevant authorities, the Court concludes that Plaintiffs' vagueness challenge is moot.[15] Vagueness claims seek to invalidate the challenged statute, but the Proclamation here is no longer in effect. Just like the overbreadth claims that the Court previously deemed moot, the void-for-vagueness claim is also "necessarily forward-thinking." *See Rock for Life-UMBC*, 411 F. App'x at 550.

In the alternative, the Court finds that the Proclamation was not unconstitutionally vague. Because "perfect clarity and precise guidance have never been required," *Ward*, 491 U.S. at 794,

---

[15] Mecklenburg County did not argue mootness. Nevertheless, the Court may (and must) raise the issue *sua sponte*, as mootness deprives the Court of subject matter jurisdiction. *See Friedman's Inc v. Dunlap*, 290 F.3d 191, 197 (4th Cir. 2002).

the failure of Defendants to define "essential businesses" and "essential activities" in a hypergranular fashion was not constitutionally significant. *See, e.g.*, *Case v. Ivey*, 542 F. Supp. 3d 1245, 1272 (N.D. Ala. 2021) (rejecting vagueness challenge to a stay-at-home order in qualified immunity analysis). The Proclamation devoted six pages to definitions of those two key terms, giving "persons of ordinary intelligence" ample notice about what conduct was and was not prohibited. The Court will dismiss the void-for-vagueness challenge.

### ii. Procedural Due Process

Mecklenburg County also urges the Court to dismiss Plaintiffs' procedural due process claim. To establish a procedural due process claim, Plaintiffs must show that inadequate government procedures deprived them of some liberty or property interest. *See Iota Xi*, 566 F.3d at 146.

Mecklenburg County acknowledges that notice and a hearing is generally required before depriving someone of liberty or property, but adds that "a hearing is not required when the government action at issue is a generally applicable law or order." ECF No. 40 at 18. The Court agrees that the Proclamation was a "generally applicable law or order." In such a situation, "the legislative determination provides all the process that is due." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 432–33 (1982). Plaintiffs do not appear to contest the point. Accordingly, the Court will dismiss Plaintiffs' procedural due process claim.

### f. Fourteenth Amendment Equal Protection Claim

Finally, Mecklenburg County moves to dismiss Plaintiffs' Equal Protection claim. The Equal Protection Clause of the Fourteenth Amendment requires that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. XIV, § 1. When a legislative classification treats similarly situated individuals differently, the challenged

classification is reviewable under strict scrutiny if it "violates a fundamental right or is drawn upon a suspect classification such as race, religion, or gender." *Giarratano*, 521 F.3d at 303. Otherwise, it is reviewable under rational basis review, and is "presumed to be constitutional . . . for the simple reason that classification is the very essence of the art of legislation." *Id*. To displace the presumption of constitutionality, the plaintiff must "negate every conceivable basis which might support the legislation." *Id*.

Here, the classifications established in the Proclamation do not violate a fundamental right, nor are they drawn upon suspect classifications. "[A] State does not violate the Equal Protection clause merely because the classifications made by its laws are imperfect. If a classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality." *Id*. (cleaned up). Rational basis applies here, and the Court concludes that as a matter of law, Plaintiffs cannot negate "every conceivable basis" for the legislation sufficient to displace the presumption of constitutionality. The Equal Protection claim must be dismissed.

## III.    ORDER

**IT IS THEREFORE ORDERED** that:

1. Defendant Mecklenburg County's Motion to Dismiss (ECF No. 39) is **GRANTED IN PART** and **DENIED IN PART**, as stated in this Order.

2. Defendant City of Charlotte's Motion to Dismiss (ECF No. 41) is **DENIED**.

**SO ORDERED**.

Signed: March 1, 2022

Graham C. Mullen
United States District Judge